720 P.2d 1243

**RAMAH NAVAJO SCHOOL BOARD, INC., and Lembke Construction Company, Inc., Petitioners-Appellees,**

v.

**BUREAU OF REVENUE, State of New Mexico, Respondent-Appellant.**

**No. 7960.**

Court of Appeals of New Mexico.

Jan. 7, 1986.

Certiorari Quashed June 3, 1986.

Paul G. Bardacke, Atty. Gen., Gerald B. Richardson, Sp. Asst. Atty. Gen., Santa Fe, for respondent-appellant.

Michael P. Gross, Roth, Van Amberg, Gross, Amarant & Rogers, Santa Fe, for petitioners-appellees.

## OPINION

BIVINS, Judge.

We withdraw the opinion filed on December 12, 1985, and substitute the following.

From an order awarding petitioners Ramah (Ramah School Board, Inc., and Lembke Construction Company, Inc.) attorney's fees pursuant to 42 U.S.C. Section 1988 following remand from the United States Supreme Court, respondent Bureau (Bureau of Revenue, State of New Mexico) appeals. The Bureau raises three issues:

1. Whether Ramah's complaint sufficiently pled a 42 U.S.C. Section 1983 violation so as to allow an attorney's fee award under Section 1988;

2. Whether the Bureau is a "person" within the meaning of Section 1983; and

3. Whether the complaint states a cause of action cognizable under Section 1983.

We answer each issue in the affirmative and, therefore, affirm.

In 1978, Ramah sued for a refund of gross receipts taxes paid. This court affirmed a judgment in favor of the Bureau. *Ramah Navajo School Board Inc. v. Bureau of Revenue*, 95 N.M. 708, 625 P.2d 1225 (Ct.App.1980), *cert. quashed*, 96 N.M. 17, 627 P.2d 412 (1981), *rev'd*, 458 U.S. 832, 102 S.Ct. 3394, 73 L.Ed.2d 1174 (1982). Ramah petitioned the United States Supreme Court which reversed on the basis that federal law preempted the assessment of the New Mexico tax on proceeds from the construction of a school on the Ramah Navajo Reservation. *Ramah Navajo School Board Inc. v. Bureau of Revenue*, 458 U.S. 832, 102 S.Ct. 3394, 73 L.Ed.2d 1174 (1982).

Following remand, Ramah filed a motion for an award of attorney's fees under Section 1988, the Federal Civil Rights Attorney's Fees Awards Act. After a hearing, the trial court awarded to Ramah attorney's fees. The parties stipulated as to the amount; therefore, the issue on appeal involves only the legality of the award.

In the Civil Rights Attorney's Fees Awards Act of 1976, Congress authorized the awarding of attorney's fees in a number of specific civil rights actions. The Act, in pertinent part, provides for the allowance of attorney's fees:

> [I]n any action or proceeding to enforce a provision of sections [42 U.S.C. §§ ] 1981, 1982, *1983*, 1985 and 1986 title IX of Public Law 92–318, [or in any civil action or proceeding, by or on behalf of the United States of America, to enforce, or by charging a violation of, a provision of the United States Internal Revenue Code], or Title VI of the Civil Rights Act of 1964, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of costs.

42 U.S.C. § 1988. (Emphasis added.)

Ramah claims entitlement to Section 1988 attorney's fees because its original action qualifies as one to enforce a provision of Section 1983, and because it prevailed in the lawsuit.

Section 1983 provides:

> Every person who, acting under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. For the purposes of this action, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

In order for Ramah to succeed, it must have pled a Section 1983 cause of action; the Bureau must be a "person"

within the meaning of Section 1983; and the cause of action must be one that is cognizable under Section 1983. The Bureau claims that Ramah fails each of those requirements. We now examine the Bureau's contentions.

### 1. Did the complaint sufficiently plead a Section 1983 violation?

In *Gomez v. Toledo,* the United States Supreme Court stated that by its "plain terms," Section 1983 requires "two—and only two—allegations." 446 U.S. 635, 640, 100 S.Ct. 1920, 1923, 64 L.Ed.2d 572 (1980). First, the plaintiff must allege that he was deprived of a federal right. Second, the plaintiff must contend that the person who deprived him of the federally protected right was acting under the color of state or territorial law. *Id.*

While the Supreme Court, in *Gomez,* was discussing the standard of pleading required in a Section 1983 action when qualified immunity is at issue, lower courts, in cases more factually similar to ours, have basically reiterated the *Gomez* standard of pleading. For instance, in *Harradine v. Board of Supervisors,* a voting rights case, the plaintiff argued that the distribution and apportionment of the Board violated the equal protection clause of the Fourteenth Amendment and sections of the New York constitution. 73 A.D.2d 118, 425 N.Y.S.2d 182 (1980). The plaintiff prevailed in the suit and then sought attorney's fees under Section 1988 even though he had not specifically alleged, in his complaint or at trial, a Section 1983 violation. Accordingly, the question before the *Harradine* court, was whether a plaintiff who prevails in a state court suit, not arguing a Section 1983 violation but seeking to vindicate a federal civil right, should be allowed to recover Section 1988 attorney's fees. In answering that question, the court first noted that the purpose of Section 1988 was to encourage private citizens to act as private attorneys general in enforcing civil rights and that Section 1988 should be construed so as to effectuate that purpose. The court, therefore, allowed recovery on the basis that "[t]he Civil Rights Attorneys

Fees Awards Act must be broadly applied to achieve its remedial purpose." *Id.* at 126, 425 N.Y.S.2d at 188.

Similarly, in *Gumbhir v. Kansas State Board of Pharmacy,* 231 Kan. 507, 646 P.2d 1078 (1982), *cert. denied,* 459 U.S. 1103, 103 S.Ct. 724, 74 L.Ed.2d 950 (1983), the plaintiff argued in his complaint that the Board's denial of his license application violated his rights under the First, Fifth, and Fourteenth Amendments as well as Article 1, Section 8 of the United States Constitution. The plaintiff failed to plead specifically a Section 1983 violation. The plaintiff prevailed at trial with the court not reaching his claimed constitutional violations. He then sought attorney's fees under Section 1988. While acknowledging that "the better practice is to specifically plead a violation of Section 1983," the Kansas Supreme Court invoked Kansas' liberal rules of notice pleading to rule that the plaintiff had adequately pled a violation of his civil rights. *Id.* at 514, 646 P.2d at 1085. *See also Fairbanks Correctional Center Inmates v. Williamson,* 600 P.2d 743 (Alaska 1979); *Boldt v. State,* 101 Wis.2d 566, 305 N.W.2d 133, *cert. denied,* 454 U.S. 973, 102 S.Ct. 524, 70 L.Ed.2d 393 (1981). This result is consistent with New Mexico's liberal rules of notice pleading. *See* N.M.Civ.P.Rule 8 (Repl.Pamp.1980); *Temple Baptist Church, Inc. v. City of Albuquerque,* 98 N.M. 138, 646 P.2d 565 (1982).

■ Ramah specifically alleged that the Bureau, in implementing its tax program, was acting "under color of the New Mexico Gross Receipts and Compensating Tax Act," and that the tax "constitutes interference by the State of New Mexico in Navajo self-government in violation of the Treaty of 1868 *and the laws of the United States.*" (Emphasis added.) Based on these authorities and the pleadings, we hold that Ramah's failure to plead specifically a Section 1983 violation does not bar its recovery of Section 1988 attorney's fees.

Two recent New Mexico cases do not persuade us differently. Both are distinguishable from the present case. In *Gar-*

*cia v. State Board of Education,* this court denied plaintiff's request for attorney's fees, a request first asserted on appeal. 102 N.M. 306, 694 P.2d 1371 (Ct.App.), *cert. quashed,* 102 N.M. 293, 694 P.2d 1358 (1985). We based our refusal on five grounds: first, the action was not brought under Section 1983; second, the plaintiff did not plead or prove that his civil rights were violated; third, the plaintiff did not prevail in the lawsuit; fourth, the plaintiff offered no proof that a Section 1988 award can be made when a Section 1983 claim is raised, for the first time, on appeal; and, fifth, Section 1988 does not authorize an award of attorney's fees in an administrative proceeding.

In this case, Ramah prevailed. Ramah also demonstrated that a Section 1988 award may be made even though the case was not specifically litigated under Section 1983. Ramah did argue, in its complaint, that a federal right had been violated. Finally, this case does not involve an administrative proceeding.

In *Chapman v. Luna,* the plaintiffs prevailed, in part, in their challenge to the Albuquerque/Bernalillo County Motor Vehicle Emission Inspection Program. 101 N.M. 59, 678 P.2d 687 (1984). On remand to the district court, plaintiffs sought Section 1988 fees because the state supreme court had ruled that a provision of the emissions inspection program violated "equal protection standards." In plaintiffs' complaint, however, they had failed to refer specifically to the New Mexico Constitution, the United States Constitution, Section 1983, or Section 1988. The district court rejected plaintiffs' claim to Section 1988 fees, and the state supreme court affirmed. 102 N.M. 768, 701 P.2d 367, *cert. denied,* — U.S. —, 106 S.Ct. 345, 88 L.Ed.2d 292 (1985).

The supreme court held that the plaintiffs were unable to show that a "deprivation of a federal constitutional right was raised and decided in their favor * * *." 102 N.M. at 769, 701 P.2d at 368. The supreme court stated that in deciding *Chapman v. Luna,* while not specifically referring to the United States Constitution or the New Mexico Constitution, the court had based its decision on a violation of the New Mexico equal protection clause. Because the plaintiffs had not pled a federal claim and the court did not decide the case on the basis of a federal claim, the case was not decided under the federal Constitution. Therefore, an award of Section 1988 attorney's fees would not be appropriate. The court did indicate, however, that it might have reached a different conclusion if the plaintiffs had specifically pled a federal equal protection claim *or* a Section 1983 claim, and the court had decided the case on the basis of a federal claim.

*Chapman,* therefore, is distinguishable from our case. Ramah did specifically plead violations of federal law, and the case was decided on federal grounds.

■ The Bureau also argues that Ramah erred in not expressly praying in its complaint for the award of Section 1988 attorney's fees. This argument is not convincing. By its express language, Section 1988 dictates that a "court, in its discretion, may allow the prevailing party * * * a reasonable attorney's fee *as part of costs.*" (Emphasis added.) Each of the counts in Ramah's complaint contained a prayer for relief which stated "for *costs* of this action, and further such relief as to the Court seems just." (Emphasis added.) Additionally, the concluding prayer requested, in addition to the tax refund, the declaratory judgment, and the injunction, "Such other relief, *including costs,* interest, and so on, as the Court deems proper." (Emphasis added.) Therefore, Ramah's failure to pray expressly for Section 1988 attorney's fees is not fatal to the award of attorney's fees. *See also Maine v. Thiboutot,* 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980).

## 2. Whether the Bureau is a "person" within the meaning of Section 1983.

At the outset of this discussion, we recognize that the United States Supreme Court, in *Hutto v. Finney,* ruled that in passing Section 1988, Congress partially

abrogated states' Eleventh Amendment immunity, pursuant to its plenary power to enforce the Fourteenth Amendment. 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978). The Court's ruling in *Hutto*, however, does not resolve the problem before us. In order to determine whether the trial court erred in awarding to Ramah Section 1988 attorney's fees, we must first decide whether Ramah pled a Section 1983 violation. Accordingly, we must determine whether the Bureau is a "person" within the meaning of Section 1983, and, therefore, capable of violating that section.

The question requires an analysis of congressional intent. For a long time, the answer, if not the rationale, was clear. Recent decisions, however, have resulted in a different understanding of the class of defendants made liable by Congress under Section 1983. Consequently, a more extensive analysis than was formerly required becomes necessary.

 When Congress enacted Section 1983, it chose not to abrogate the state's sovereign immunity or Eleventh Amendment immunity. *Quern v. Jordan*, 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979). Sovereign immunity and Eleventh Amendment immunity are, of course, distinct concepts, but both immunities are designed to protect the same object——state government. *Civil Actions Against State Government: Its Divisions, Agencies and Officers* (Winborne, ed. 1982). The Eleventh Amendment shields the operation of state governments from intrusions from the federal judiciary while sovereign immunity protects state government affairs from interference by plaintiffs and state courts. *Id.* Therefore, when a Section 1983 suit is brought in federal court, the court analyzes whether the defendant is a "person" within the meaning of Section 1983 or, more meaningfully expressed, whether the Eleventh Amendment bars the suit from being brought against that defendant. Similarly, in Section 1983 actions brought in state courts, the court determines whether sovereignty immunity bars

the suit. *Gumbhir v. Kansas State Board of Pharmacy.*

Before 1977, the belief generally held was that state agencies were not persons within the meaning of Section 1983. *Gumbhir v. Kansas State Board of Pharmacy.* In 1978, the United States Supreme Court handed down a landmark decision in *Monell v. New York City Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). In *Monell*, the Court ruled that the Eleventh Amendment did not bar suit under Section 1983 against municipalities and other local governments. Municipalities and local governments, therefore, were "persons" under Section 1983.

The Court's ruling, in *Monell*, created confusion in the lower courts. Some courts, in the wake of *Monell*, reasoned that there is no logical reason to distinguish between state and local agencies and, accordingly, ruled that states are "persons." *Stanton v. Godfrey*, 415 N.E.2d 103 (Ind.App.1981); *Atchison v. Nelson*, 460 F.Supp. 1102 (D.Wyo.1978). Most courts, however, have determined that *Monell* did nothing to alter either the Eleventh Amendment or sovereign immunity protective cloak of the states. *Holladay v. State of Montana*, 506 F.Supp. 1317 (D.Mont.1981) (memo.op.); *Ginter v. State Bar of Nevada*, 625 F.2d 829 (9th Cir.1980).

 That the Eleventh Amendment is still a vital bar to a Section 1983 cause of action, in federal court, against a state or its agencies was articulated by the United States Supreme Court in *Quern v. Jordan*. The Court held that Congress, in enacting Section 1983, did not intend to destroy the states' Eleventh Amendment immunity from suits brought in federal court. *Quern*. It, therefore, logically follows that Congress also did not intend, in adopting Section 1983, to abrogate the states' sovereign immunity from Section 1983 suits brought in state courts. Suits against states or their agencies, however, may be brought under Section 1983 in state or federal court if the state has waived its Eleventh Amendment or sovereign immunity,

by expressly consenting to suit. *Boldt v. State.*

The Eleventh Amendment immunity, nevertheless, is not absolute. The United States Supreme Court has carved out an exception: prospective injunctive relief. In *Edelman v. Jordan,* the Court ruled that "a federal court's remedial power, consistent with the Eleventh Amendment, is necessarily limited to prospective injunctive relief * * * and may not include a retroactive award which requires the payment of funds from the state treasury * * *." 415 U.S. 651, 677, 94 S.Ct. 1347, 1362, 39 L.Ed.2d 662 (1974) (citations omitted). In *Milliken v. Bradley,* the Court ruled that the prospective relief can require the expenditure of state funds so long as the relief comes into effect prospectively. 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977).

Lower federal courts, when confronted with the question of whether the state or its agency is a "person" under Section 1983, appear to analyze what relief is sought. If the plaintiff seeks prospective injunctive relief, the Eleventh Amendment will not bar the suit. If, however, the plaintiff seeks monetary damages, the Eleventh Amendment precludes the cause of action. *Tayyari v. New Mexico State University,* 495 F.Supp. 1365 (D.N.M.1980); *Gay Student Services v. Texas A & M University,* 612 F.2d 160 (5th Cir.), *cert. denied,* 449 U.S. 1034, 101 S.Ct. 608, 66 L.Ed.2d 495 (1980).

■ State courts, however, have not uniformly distinguished on the basis of relief sought whether sovereign immunity is a bar to a Section 1983 action. In *DeVargas v. State, ex rel. New Mexico Department of Corrections,* in which the plaintiff sought damages under Section 1983, this court ruled that the suit was a "nullity" because "[t]he State and its Department of Corrections are not persons within the meaning of § 1983." 97 N.M. 447, 449, 640 P.2d 1327, 1329 (Ct.App.1981), *cert. quashed,* 97 N.M. 563, 642 P.2d 166 (1982). This court did not, however, explain the rationale for its decision. Therefore, there

are two possibilities as to the relevant law in New Mexico. First, it may be that the state and its agencies never are "persons" within the meaning of Section 1983; or, it may be that because the plaintiff sought damages in *DeVargas,* rather than prospective injunctive relief, the court ruled that the doctrine of sovereign immunity blocked the suit.

The second standard offers the better reasoned approach. While, as discussed earlier, the Eleventh Amendment and sovereign immunity are distinct concepts, each seeks to provide protection for the state treasuries. If the Eleventh Amendment does not bar a suit in which prospective injunctive relief is sought, there is no logical reason why sovereign immunity should bar such a suit in state court. Accordingly, the Kansas Supreme Court, in *Gumbhir v. Kansas State Board of Pharmacy,* ruled that "the sounder view in a case such as this, where prospective injunctive relief is sought, is that a state agency should be considered a 'person' under [§ 1983]." 231 Kan. at 513, 646 P.2d at 1084. *See also Woodbridge v. Worcester State Hospital,* 384 Mass. 38, 44, 423 N.E.2d 782, 786 n. 7 (1981).

■ We note that in order to avoid the defense of Eleventh Amendment immunity, a plaintiff in federal court may be required to name an individual state officer as defendant. *See generally Milliken v. Bradley,* 433 U.S. 267, 289–290, 97 S.Ct. 2749, 2761–62, 53 L.Ed.2d 795 (1977) (noting the history of the prospective-compliance exception reaffirmed in *Edelman v. Jordan* ). The requirement that a plaintiff in federal court name a state officer as defendant is based on the fiction that in violating federally-protected rights, the state officer is "stripped of his official or representative character." *Ex parte Young,* 209 U.S. 123, 160, 28 S.Ct. 441, 454, 52 L.Ed. 714 (1908). Because Ramah sued in state court, this particular aspect of Eleventh Amendment immunity is not relevant. We agree with the Kansas Supreme Court that, after *Monell,* a state and its agencies may be proper defendants in state court under Section 1983, provided principles of

state sovereignity do not preclude recovery. *See Gumbhir.* For this reason, we reject the Bureau's contention on appeal that Ramah's complaint was defective because it named the agency rather than its director.

Therefore, in order to determine if the Bureau is a person, we analyze separately each relief sought by Ramah. Ramah sought three remedies: first, a refund of the tax monies; second, a declaratory judgment that imposition of the tax, in this case, was beyond the jurisdiction of the Bureau; and, finally, a permanent injunction, enjoining the Bureau from further taxation of the construction project.

In its complaint, Ramah prayed for a tax refund, pursuant to NMSA Section 72–13–40(A)(2) (Supp.1975) (now codified as NMSA 1978, Section 7–1–26(A)(2)). In enacting that statute, the legislature clearly consented to suit, allowing a claimant to bring an action against the state for a tax refund. We do not believe, however, that in enacting this statute, the state consented to suit under Section 1983.

The statute contains absolutely no reference to Section 1983, the United States Constitution, or the laws of the United States. *See* NMSA 1978, § 41–4–4 (Repl. Pamp.1982). Additionally, the request for the tax refund is a recovery more akin to money damages than to prospective injunctive relief. In *Edelman v. Jordan,* the plaintiffs argued that the defendants were not promptly processing, as authorized, assistance applications. The court of appeals allowed the plaintiffs to recover those funds which were denied by the tardy processing of the applications. The appeals court justified the refund on the basis of "equitable restitution." The United States Supreme Court rejected such a characterization and ruled that the refund violated the Eleventh Amendment. The Court stated that such an award was "in practical effect indistinguishable in many aspects from an award of damages against the State." 415 U.S. at 668, 94 S.Ct. at 1358. *See Ford Motor Co. v. Department of Treasury of Indiana,* 323 U.S. 459, 65

S.Ct. 347, 89 L.Ed. 389 (1945) (Eleventh Amendment bars suit in federal court for tax refund).

■ We, therefore, hold that in allowing suits against the state for tax refunds, the legislature did not intend to waive the state's sovereign immunity for suits brought under Section 1983. *See Boldt v. State.* Furthermore, Ramah's request for a tax refund essentially was a request for "equitable restitution." If posed in terms of Section 1983, the claim would have been barred by the doctrine of sovereign immunity.

Next, Ramah requested a declaratory judgment ruling that the imposition of the gross receipts tax, in this case, was beyond the jurisdiction of the Bureau. Ramah requested the declaratory judgment pursuant to the New Mexico Declaratory Judgment Act. NMSA 1953, §§ 22–6–1 through 22–6–18 (Supp.1975) (now codified at NMSA 1978, §§ 44–6–1 through 44–6–15). Section 22–6–16 of the 1975 supplement provides:

> For the purpose of the Declaratory Judgment Act, the state of New Mexico, or any official thereof, may be sued and declaratory judgment entered when the rights, status or other legal relations of the parties call for a construction of the Constitution of the state of New Mexico, the Constitution of the United States or any of the laws of the state of New Mexico or the United States, or any statute thereof.

(Citation omitted.)

■ While this statute contains no express reference to Section 1983, it does provide that the state has waived its sovereign immunity for the purpose of suits seeking "a construction of" the Constitution and laws of the United States. Such declarations do not entail awards of money damages. Therefore, it is completely consistent with the notions of sovereign immunity to rule that for the purpose of Section 1983 causes of action seeking declaratory relief, the state has waived its sovereign immunity.

In its complaint, Ramah requested an interpretation of the New Mexico Constitution, the United States Constitution, and the laws of the United States. Section 22–6–16 is, therefore, precisely on point. For purposes of the declaratory judgment in this action, New Mexico has consented to suit.

■ Finally, Ramah sought a permanent injunction against the imposition of the gross receipts tax on the school construction project. This clearly represents a request for prospective injunctive relief. The doctrines of Eleventh Amendment and sovereign immunity do not bar such suits. *Edelman v. Jordan; Gumbhir v. Kansas State Board of Pharmacy.* Therefore, for the purpose of the prospective injunctive relief, the Bureau is considered a "person" within the meaning of Section 1983.

After separately analyzing the three remedies which Ramah sought, it becomes apparent that the Bureau may not be considered a "person" for purpose of the refund (because sovereign immunity precludes such a claim being brought under Section 1983), but that the Bureau may be considered a "person" for purposes of the declaratory and injunctive relief. Such inconsistency is not fatal to Ramah's claim. In *Edelman v. Jordan*, the plaintiffs sought both damages and injunctive relief. Relying upon the Eleventh Amendment, the Court ruled that the suit was improper to the extent that monetary liability was sought. The suit was proper, however, insofar as prospective injunctive relief was requested. *See also Milliken v. Bradley.*

■ Applying that analysis to our case, the fact that the Bureau is not a "person" subject to liability under Section 1983 for purpose of the refund recovery would not foreclose Ramah's statement of a cause of action under that section. Because the Bureau is considered a "person" for purposes of the declaratory and injunctive recoveries, sovereign immunity concerns do not foreclose the determination of whether, in its complaint, Ramah stated a cause of action under Section 1983.

### 3. Whether Ramah alleged the violation of a right actionable under Section 1983.

That Ramah sufficiently alleged that the Bureau, acting under color of state law, interfered in Navajo self-government in violation of the Treaty of 1868 and the laws of the United States does not of itself justify an award of attorney's fees under Section 1988. These must be a "deprivation of any rights, privileges, or immunities secured by the Constitution and laws." In short, there must be a violation of a federally protected right.

Prior to 1980, the prevailing attitude was that the phrase "and laws" was limited to civil rights or equal protection laws. *See Chapman v. Houston Welfare Rights Organization*, 441 U.S. 600, 99 S.Ct. 1905, 60 L.Ed.2d 508 (1979). In a 1980 decision, *Maine v. Thiboutot*, the United States Supreme Court, however, radically expanded the scope of Section 1983 protection. 448 U.S. 1, 100 S.Ct. 2502 , 65 L.Ed.2d 555 (1980). Relying, essentially, upon the plain meaning of the language of Section 1983, the Court held that because Congress had attached "no modifiers" to the phrase "and laws," Section 1983 encompassed violations of federal statutory laws. *Id.* at 5, 100 S.Ct. at 2504. Accordingly, since the statutory action was appropriately brought as a Section 1983 action, and since Section 1988 makes no exception for statutory violations of Section 1983, Section 1988 attorney's fees clearly applied to that case.

Since deciding *Thiboutot*, however, the Court has narrowed the expansive scope of its ruling. Two limitations now preclude suit under Section 1983 based upon statutory violations. The first limitation arises when Congress includes within the legislation comprehensive remedial procedures. *Middlesex County Sewerage Authority v. National Sea Clammers Association*, 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981). The second limitation is more pertinent to the issue before us. In *Pennhurst State School and Hospital v. Halderman*, the Court ruled that in order for a statu-

tory violation to give rise to a Section 1983 violation, the federal statute must have created a right, privilege, or immunity. 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981).

Because the Bureau relies heavily on *Pennhurst* in arguing that a federally protected right was not at issue in this case, we shall analyze *Pennhurst* in some depth. In *Pennhurst,* residents of a state hospital for the care of the mentally retarded challenged their conditions of confinement. The Third Circuit Court of Appeals issued a ruling in favor of the residents, holding that the "bill of rights" provision of the Developmentally Disabled Assistance and Bill of Rights Act had been violated. *Halderman v. Pennhurst State School and Hospital,* 612 F.2d 84 (3d Cir.1979) (en banc).

On appeal, the Supreme Court, in determining whether Congress had intended, in passage of the Act, to create substantive, enforceable rights, first pinpointed the source of Congress' power to legislate. The Court concluded that the origin of the legislative power was Congress' spending power. When, pursuant to a federal grant program, Congress imposes enforceable, financial obligations on the states, Congress must "speak with a clear voice" in order to "enable the States to exercise their choice [to participate in the program] knowingly, cognizant of the consequences of their participation." 451 U.S. at 17, 101 S.Ct. at 1540. Because the "bill of rights" section of the Act contained no such express language, the Court held that the "bill of rights" was essentially precatory and, as such, unenforceable.

Ramah, in its complaint, based its suit on two, interrelated theories which are relevant to this appeal. The first theory was that the Bureau's imposition of the gross receipts tax on the school construction project unduly interfered with Navajo self-government, pursuant to the Indian Self-Determination and Educational Assistance Act (25 U.S.C. §§ 450a–450n) and the Treaty of 1868. Second, Ramah argued that the Supremacy Clause barred the imposition of the gross receipts tax because the collection of the tax burdened and interfered with "a clear federal policy and program for the education of Indian children."

The Bureau is correct in its assertion that the Supremacy Clause, alone, does not create federal substantive rights but merely is a policy of federalism. *See Chapman v. Houston Welfare Rights Organization.* The Indian Self-Determination and Educational Assistance Act provides no broad remedial procedures so the *Middlesex* limitation is not applicable. Ramah does not disagree; therefore, the appellate issue is whether Congress has created a federally-protected right which New Mexico violated in collecting the gross receipts tax. Under *Pennhurst,* we must examine the origin and nature of the Indian Self-Determination and Educational Assistance Act in order to resolve the issue. The Bureau contends that the Act merely declares federal policy. We disagree.

Congress, in its statement of findings and its declaration of the policy of the Act provided:

### § 450. Congressional statement of findings

(a) The Congress, after careful review of the Federal Government's historical and special legal relationship with, and resulting responsibilities to, American Indian people, finds that—

(1) the prolonged Federal domination of Indian service programs has served to retard rather than enhance the progress of Indian people and their communities by depriving Indians of the full opportunity to develop leadership skills crucial to the realization of self-government, and has denied to the Indian people an effective voice in the planning and implementation of programs for the benefit of Indians which are responsive to the true needs of Indian communities; and

(2) the Indian people will never surrender their desire to control their relationships both among themselves and with non-Indian governments, organizations, and persons.

(b) The Congress further finds that—

(1) true self-determination in any society of people is dependent upon an educational process which will insure the development of qualified people to fulfill meaningful leadership roles;

(2) the Federal responsibility for and assistance to education of Indian children has not effected the desired level of educational achievement or created the diverse opportunities and personal satisfaction which education can and should provide; and

(3) parental and community control of the educational process is of crucial importance to the Indian people.

**450a. Congressional declaration of policy**

(a) The Congress hereby recognizes the obligation of the United States to respond to the strong expression of the Indian people for self-determination by assuring maximum Indian participation in the direction of educational as well as other Federal services to Indian communities so as to render such services more responsive to the needs and desires of those communities.

(b) The Congress declares its commitment to the maintenance of the Federal Government's unique and continuing relationship with and responsibility to the Indian people through the establishment of a meaningful Indian self-determination policy which will permit an orderly transition from Federal domination of programs for and services to Indians to effective and meaningful participations by the Indian people in the planning, conduct, and administration of those programs and services.

(c) The Congress declares that a major national goal of the United States is to provide the quantity and quality of educational services and opportunities which will permit Indian children to compete and excel in the life areas of their choice, and to achieve the measure of self-determination essential to their social and economic wellbeing.

25 U.S.C. §§ 450, 450a.

At first examination, the Act might arguably fall within the limitation *Pennhurst* placed upon federal statutory violations giving rise to a Section 1983 proceeding. As the Bureau argues, it could be that the Act "merely declares the federal government's policy of encouraging Indian self-government and Indian control of Indian education." Cases which the Bureau cites lend some support to that position. For instance, in *Perry v. Housing Authority of the City of Charleston,* the tenants of public housing projects sought declaratory and injunctive relief from indecent housing. 664 F.2d 1210 (4th Cir.1981). They alleged that the defendant's violation of various housing acts gave rise to a Section 1983 violation. The court ruled, however, that the acts created no federally protected substantive rights. Rather, the federal appropriations were designed to assist the states in remedying poor housing conditions. *See also Weems v. Pierce,* 534 F.Supp. 740 (C.D.Ill.1982) (federal housing acts created no right to compel aid recipients to provide rental assistance); and *Dopico v. Goldschmidt,* 518 F.Supp. 1161 (S.D.N.Y.1981) (funding statutes created no substantive rights of handicapped access to mass transit). Applying a similar argument in our case, the Bureau contends that the Self-Determination and Educational Assistance Act conferred no rights upon Ramah but merely articulated Congress' encouragement of and assistance in the realization of Indian self-government and self-education.

The Bureau's argument, however, ignores the precise factual setting of this lawsuit. This case does not involve a federal/state funding statute such as generated the *Pennhurst* ruling. This case involves the unique relationship between the federal government and the Indian tribes. The source of Congress' power to legislate in federal grant cases is its spending power. In the grant cases, valid concerns legitimate courts' reluctance to interpret language in grant programs as creating substantive, enforceable federal rights. As one commentator has pointed out:

Damages awards and attorney's fees, for example, may deplete funds from the

very purposes which the program was meant to serve. There is the realistic possibility that, at least in the case of marginal programs, governments will decline to participate if they see serious, and unpredictable, costs. Additionally, extensive judicial involvement blurs matters of accountability.

Brown, *Whither Thiboutot? Section 1983, Private Enforcement, and the Damages Dilemma,* 33 DePaul L.Rev. 31, 55 (1984).

In our case, however, the origin of Congress' legislative authority was the Indian Commerce Clause. U.S. Const. art. 1, § 8, cl. 3. Concerns in the federal grant area, which inhibit *Thiboutot,* are not at issue here. Under the Indian Commerce Clause, Congress has broad authority to regulate tribal affairs. *Morton v. Mancari,* 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974). Within that grant of power is the recognition of the guardian-ward relationship which exists between the federal government and the Indian tribes. *Id., United States v. Sandoval,* 231 U.S. 28, 34 S.Ct. 1, 58 L.Ed. 107 (1913). The guardian-ward relationship is based upon the tribes' dependence on the federal government "to aid the Indian in coping with an alien civilization which has inexorably altered the Indian's traditional way of life." Comment, *The Indian Battle for Self-Determination,* 58 Calif.L.Rev. 445, 450 (1970). Based upon this unique relationship, Congress, in enacting the Self-Determination and Educational Assistance Act, granted to the Indians the *right* to coordinate the education of their children on the reservation, in express recognition of the right's "crucial importance to the Indian people." 25 U.S.C. § 450(b)(3). By implication, Congress also granted the tribes an *immunity* from state taxation. The Bureau, by imposing the gross receipts tax on the school construction job, not only violated that right but also that immunity. *See Chase v. McMasters,* 573 F.2d 1011 (8th Cir.), *cert. denied,* 439 U.S. 965, 99 S.Ct. 453, 58 L.Ed.2d 423 (1978).

In its decision in this case, the United States Supreme Court not only recognized that the federal and tribal interests arise from the Indian Commerce Clause, but also recognized an additional, independent source, "the semi-autonomous status of Indian tribes." 458 U.S. at 837, 102 S.Ct. at 3398. Either of these "independent but related" interests bar exercises of state authority over commercial activity on Indian reservations. The Court quoted with approval:

"[e]ither [interest], standing alone, can be a sufficient basis for holding state law inapplicable to activity undertaken on the reservation or by tribal members. They are related, however, in two important ways. The right of tribal self-government is ultimately dependent on and subject to the broad power of Congress. Even so, traditional notions of Indian self-government are so deeply engrained in our jurisprudence that they have provided an important 'backdrop,' * * * against which vague or ambiguous federal enactments must always be measured."

*Id.* at 837–38, 102 S.Ct. at 3398, *quoting from White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 143, 100 S.Ct. 2578, 2583, 65 L.Ed.2d 665 (1980).

While the Court relied, in its holding, on the Indian Commerce Clause, the result we reach today also finds support in the second barrier which the Court indicated could be used to block state intrusion on commercial activity on the reservation, the semi-autonomous status of the Indian tribes. The tribe's *right* of self-government, however, is limited by broad Congressional power. *Id.* Congress, in our case, however, did not abrogate that tribal right but articulated that right in the Indian Self-Determination and Educational Assistance Act. Congress, thereby, gave the full force and effect of federal law to the tribal right to control the educational processes on the reservation.

Our discussion might end here except for three cases concerning tribal claims for Section 1988 attorney's fees which, we believe, merit discussion. In *White Mountain Apache Tribe v. Williams,* —— F.2d

——, No. 81–5348 (9th Cir. Dec. 19, 1985), the Arizona Highway Department and the Arizona Highway Commission assessed a tax upon a logging company which had contracted with the White Mountain Apache Tribe. The tribe had organized a tribal enterprise to engage in the harvest of timber. The United States Supreme Court ruled that the state taxes were preempted by a comprehensive federal regulatory plan which supervised the harvest and sale of tribal timber. *White Mountain Apache Tribe v. Bracker.* The tribe then requested an award of Section 1988 attorney's fees which the district court granted, and the Ninth Circuit Court of Appeals reversed. *White Mountain Apache Tribe v. Williams,* No. 81–5348 (9th Cir. Feb. 7, 1984). When we filed our first opinion, in this case, the Ninth Circuit had decided to reconsider its ruling. Since the filing of our first opinion, the Ninth Circuit has issued its second opinion, again reversing the district court. Because the Bureau relies heavily on this decision, we discuss it.

*White Mountain* is distinguishable from our case in two respects. First, the federal statutes at issue in *White Mountain* were regulatory in nature. There was no evidence of Congressional intent to create individual rights; whereas, in our case, the entire basis of the litigation was to provide a school for the Ramah children. While education does not rise to the level of a fundamental right, for equal protection purposes, "education is perhaps the most important function of state and local governments." *San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 29, 93 S.Ct. 1278, 1294, 36 L.Ed.2d 16 (1973), *quoting from Brown v. Board of Education,* 347 U.S. 483, 493, 74 S.Ct. 686, 691, 98 L.Ed. 873 (1954). Similarly, it stands to reason that the education of Indian children is one of the most important functions that the tribal government performs. There can be no doubt but that the Self-Determination and Educational Assistance Act concerns "individual rights." If Ramah had not undertaken to operate a school system, the tribal children would have been forced either to curtail their educations or to leave the reservation in order to obtain educations. Either option would have been contrary to the essence of the Act.

Second, and more importantly, *White Mountain* is not inconsistent with the result which we reach today. The Ninth Circuit, relying on *Chapman v. Houston Welfare Rights Organization,* held that a violation of the Supremacy clause could not provide the basis for a Section 1983 cause of action. That holding is in accord with our result. Our case, however, is distinguishable. Congress here has created a federally enforceable right. Individual rights are presently at issue.

After we heard oral argument in this case, the Bureau directed our attention to additional authority, a recent federal district court opinion. *Yakima Indian Nation v. Whiteside,* 617 F.Supp. 735 (D.Wash.1985). In that case, the court refused to find that the tribe's "right" to be free from the county's zoning authority was a federally enforceable right for purposes of Section 1983. According to the court, a Supremacy Clause violation alone, as in *White Mountain,* does not give rise to a Section 1983 cause of action. The court's holding also is consistent with the result we reach today. As with *White Mountain,* our case, however, is distinguishable. A right, cognizable under Section 1983, is involved here.

In a third recent case, the Arizona Court of Appeals ruled that the Indian trader statutes created rights enforceable under Section 1983. *Central Machinery Co. v. Arizona,* 12 Ind.L.Rptr. 5073 (June 27, 1985). Therefore, the Gila River Indian Tribe could recover Section 1988 attorney's fees. The tribe had prevailed in a lawsuit in which the United States Supreme Court ruled that the Indian trader statutes preempted Arizona's imposition of a transaction privilege tax upon a non-Indian tractor merchant. *Central Machinery Co. v. Arizona State Tax Commission,* 448 U.S. 160, 100 S.Ct. 2592, 65 L.Ed.2d 684 (1980). The merchant, as in our case, had passed the tax onto the Indian purchasers.

In determining whether Congress intended to create a right enforceable under Section 1983, the Arizona court looked first to the purpose of the federal Indian trader statutes. Because the avowed Congressional intent was to protect the Indians from state taxation of their transactions with traders, the court translated that Congressional purpose into a federally protected right "to be free from state taxation on their transactions with traders." 12 Ind.L. Rptr. at 5074. The court's conclusion was reinforced by its finding that Congress intended to confer a "special benefit" upon the tribe.

If the *Central Machinery* standard is applied to the facts in our case, the inescapable conclusion is that the Self-Determination and Educational Assistance Act created rights enforceable under Section 1983. The express purposes of the Act are to promote Indian self-determination and to facilitate tribally coordinated educational opportunities. Accordingly, those purposes can be translated into federally protected rights. Additionally, the language of the Act is not general or regulatory in nature but specifically aims toward providing a "special benefit" for tribal members. *See also The Confederated Salish and Kootenai Tribes of the Flathead Reservation v. Moe,* 392 F.Supp. 1297 (D.Mont.1974).[1]

 In summary, we hold that the Indian Self-Determination and Educational Assistance Act created a right enforceable under Section 1983, and, therefore, that the trial court did not err in awarding Section 1988 attorney's fees to Ramah. First, the language and history of the Act evince a Congressional intent to create a tribal right to coordinate the education of its children. Second, recognition of the Indian right of self-government provides a "backdrop * * against which vague or ambiguous federal enactments must always be measured."

*White Mountain Apache Tribe v. Bracker,* 448 U.S. at 143, 100 S.Ct. at 2583. And, finally, Section 1988 should be construed liberally in order to realize the achievement of Section 1988's broad remedial purposes. *Harradine v. Board of Supervisors.*

The fact that Ramah prevailed in the litigation on the preemption claim rather than the violation of self-determination claim is not relevant. Section 1988 attorney's fees are awarded so long as the prevailing party "essentially succeeds in obtaining the relief he seeks in his claim on the merits." *Bagby v. Beal,* 606 F.2d 411, 415 (3d Cir.1979).

The judgment below is affirmed. Ramah shall recover its costs on appeal.

IT IS SO ORDERED.

ALARID and MINZNER, JJ., concur.

---

1. In *Moe,* the district court ruled that the tribe's allegation that the state had violated the Commerce Clause was sufficient to state a claim under Section 1983. In reviewing the district court's decision, the United States Supreme Court found it unnecessary to reach that question. 425 U.S. 463, 475, n. 14, 96 S.Ct. 1634, 1642, n. 14, 48 L.Ed.2d 96 (1976). *But see Consolidated Freightways Corp. of Delaware v. Kassel,* 556 F.Supp. 740 (S.D.Iowa 1983) (Commerce Clause creates no rights enforceable under § 1983). The Bureau's strong reliance upon *Kassel* might be misguided because *Kassel* is not a case involving Indians.