No.   91-425

IN THE SUPREME COURT OF THE STATE OF MONTANA

1993

---

IN RE THE MARRIAGE OF

RAMONA MAE WELLMAN,

> Petitioner and Respondent,

and

ROBERT W. WELLMAN,

> Respondent and Appellant.

---

APPEAL FROM:   District Court of the Ninth Judicial District,
In and for the County of Glacier,
The Honorable R.D. McPhillips, Judge presiding.


COUNSEL OF RECORD:

> For Appellant:

>> James D. Moore; Moore & Doran, Kalispell
Montana

> For Respondent:

>> Emilie Loring; Hilley & Loring, Missoula
Montana

> For Amicus:

>> Brenda  C.  Desmond,  Attorney  at  Law,  Missoula,
Montana;  John  St.  Clair,  Attorney  at  Law,  Fort
Washakie,  Wyoming  (Montana-Wyoming  Tribal  Court
Judges Association)

---

Submitted on Briefs:   March 26, 1992

Decided:   May 4, 1993

FILED

MAY 7 Filed: 1993

Ed Smith

CLERK OF SUPREME COURT
STATE OF MONTANA

Clerk

Justice Karla M. Gray delivered the Opinion of the Court.

This is an appeal from an order of the Ninth Judicial District Court, Glacier County, dismissing an action for equitable apportionment of a marital estate for lack of subject matter jurisdiction. We affirm.

Ramona Mae Wellman (Ramona) and Robert W. Wellman (Robert) were married in Cardston, Alberta, in November 1951 and lived for the duration of their marriage on the Blackfeet Reservation near Browning, Montana. Ramona is a member of the Blackfeet Tribe; Robert is not an Indian. They have six children, all born before 1960. The parties accumulated substantial real and personal property during their marriage, including approximately 4,000 acres of Indian trust land with legal title in the United States and beneficial ownership in Ramona.

In December 1979, Ramona filed a petition for dissolution in state district court, stating that the marriage was irretrievably broken. She did not ask the court to divide the marital assets. Robert responded in March 1980, seeking an equitable distribution of the real and personal property accumulated by the parties during their marriage or, if the property could not be equitably distributed, a monthly award for his support, care, and maintenance from the income produced from the property.

The court issued a final decree of dissolution on November 18, 1981, amended in December 1981 to state as a conclusion of law that the court had jurisdiction over the marital status. All other jurisdictional questions and all matters concerning support,

2

maintenance, and equitable distribution of property were reserved for later determination.

A pre-trial conference on the reserved issues originally was set for January 20, 1982, but was vacated for the convenience of Robert's counsel. The court, apparently on its own initiative, re-set the conference for October 17, 1984, but continued it so that Robert's counsel could complete discovery. Discovery efforts continued through 1987, and trial eventually was set for June 5, 1990.

On May 16, 1990, Ramona moved to dismiss on the grounds that the District Court lacked jurisdiction to apportion property and debts on the Blackfeet Reservation. On May 24, 1990, the court issued an order postponing the trial indefinitely; on May 29, after reviewing the file, it set the matter for trial on June 5, 1990, requesting briefs on the jurisdiction issue by June 4.

On June 5, Ramona's lawyer told the court that she had not had an opportunity to read Robert's brief. The court suggested that the parties produce their evidence on the merits of the dispute that day, while it took the matter of jurisdiction under advisement. At the close of the hearing, after Robert and Ramona had testified at length on the property they had accumulated during their marriage, the court announced that it would rule on the issue of jurisdiction before proceeding further with matters concerning the marital estate.

The District Court ultimately granted Ramona's motion to dismiss, concluding that "this Court has no jurisdiction to

adjudicate the disposition of the only significant asset of the parties, the Indian Trust Land." Robert appealed.

The sole issue on appeal is whether a Montana district court has jurisdiction to adjudicate the disposition of Indian trust land in a marital dissolution action filed in that court by a member of the Blackfeet Tribe against her non-Indian husband.

Because the District Court ruled only on the issue of jurisdiction, Robert's assertions of error regarding the contents and valuation of the marital estate are not properly before us. For purposes of reviewing the jurisdictional issue, however, we assume that the Indian trust land is the Wellmans' only significant marital asset. Even if the Wellmans did have other assets at the time of the divorce, as Robert contends, the parties agree that the Indian trust land was their most substantial asset; therefore, the District Court could not have apportioned the marital estate without exercising jurisdiction over the trust land.

I

In contending that the District Court has subject matter jurisdiction to apportion the marital estate, Robert relies on the Blackfeet Tribal Law and Order Code, which provides that "all divorces must be consummated in accordance with the State Law of Montana." Robert argues that with this provision the Blackfeet Tribe "expressly ceded jurisdiction relative to dissolutions to the Courts of Montana." We disagree.

We held in 1973 that a similar provision enacted by the Assiniboine-Sioux Tribe in 1938 did cede jurisdiction to the state.

4

Our decision was based on the evidence before us, which showed that the tribal court had granted no divorces in the intervening period and had itself interpreted the provision as ceding jurisdiction over divorce matters to the state of Montana. State ex rel. Iron Bear v. District Court (1973), 162 Mont. 335, 512 P.2d 1292. Here, the record indicates that the Blackfeet Tribal Court has consistently exercised jurisdiction over the dissolution of Blackfeet marriages. We conclude, therefore, that this provision does not cede jurisdiction to the state but merely governs the tribal court's choice of law.

Our approach is consistent with the Ninth Circuit's determination that a similar provision in the Northern Cheyenne Law and Order Code does not confer jurisdiction on Montana but instead incorporates Montana law as tribal law. Sanders v. Robinson (9th Cir. 1988), 864 F.2d 630, cert. denied, 490 U.S. 1110 (1989). Like the case before us, Sanders involved a tribal member married to a non-Indian and marital residence on an Indian reservation. Unlike Ramona Wellman, however, the Indian spouse in Sanders filed an action for divorce in the tribal court. Her non-Indian husband challenged the tribal court's jurisdiction in federal district court, and the district court granted summary judgment in favor of the tribal court. In affirming that decision, the Ninth Circuit held that in a divorce case involving an Indian "plaintiff" and a non-Indian "defendant," the tribal court has "at least concurrent" but not necessarily exclusive jurisdiction. 864 F.2d at 633.

Where an Indian tribe has asserted jurisdiction over marriage

5

and divorce actions between two of its members, we have deferred to that assertion. In In re Marriage of Limpy (1981), 195 Mont. 314, 636 P.2d 266, we deferred to an advisory opinion of the Northern Cheyenne Appellate Court, holding that the Northern Cheyenne Tribal Court has exclusive jurisdiction over dissolution of marriage actions between members of the tribe residing on the reservation. Similarly, in State ex rel. Stewart v. District Court (1980), 187 Mont. 209, 609 P.2d 290, we determined that the Crow Tribal Code gives the Crow Tribal Court exclusive jurisdiction over dissolution of marriage actions between tribal members living on the reservation.

Here, the dissolution action was brought by a tribal member against her non-Indian husband. No precedent suggests that in such a case the Blackfeet Tribal Court has exclusive jurisdiction over the dissolution, or that exercise of concurrent jurisdiction by a state district court interferes with tribal self-government. The specific issue before us, however, is whether the District Court, having dissolved the Wellmans' marriage, had subject matter jurisdiction to apportion their marital estate.

II

Indian tribes are self-governing political entities whose powers can be circumscribed only by Congress, as the United States Supreme Court made clear in United States v. Wheeler (1977), 435 U.S. 313, 323, 98 S.Ct. 1079, 1086, 55 L.Ed.2d 303, 313: "[U]ntil Congress acts, the tribes retain their existing sovereign powers. . . . Indian tribes still possess those aspects of sovereignty not

6

withdrawn by treaty or statute, or by implication as a necessary result of their dependent status."

When Wheeler was decided, Congress already had authorized state governments to assume jurisdiction over civil causes of action to which Indians are parties and which arise on Indian reservations within their boundaries. Public Law 280 (P.L. 280), codified at 28 U.S.C. § 1360. Six states assumed jurisdiction under the express terms of the statute; other states, including Montana, could "assume jurisdiction at such time and in such manner as the people of the State shall, by affirmative legislative action, obligate and bind the State to assumption thereof." Pub. L. No. 280, § 7, 67 Stat. 588, 590 (1953). The 1968 Indian Civil Rights Act repealed § 7, however, and thereafter the consent of the enrolled Indians on the reservation, expressed as a majority vote of the adult Indians voting at a special election, was required before a state could assume jurisdiction over a civil action arising on a reservation and involving a tribal member. 25 U.S.C. §§ 1322 and 1326.

With regard to the matter before us, it is undisputed that Montana has not assumed jurisdiction under P.L. 280 and the Indian Civil Rights Act. Absent such an assumption of jurisdiction, civil jurisdiction over activities of non-Indians as well as Indians on reservation lands presumptively lies in the tribal court. Fisher v. District Court (1976), 424 U.S. 382, 96 S.Ct. 943, 47 L.Ed.2d 106. To overcome that presumption, a party seeking to bring such an action in state court must show that state jurisdiction is not

7

preempted by federal statute or treaty and does not unlawfully infringe on the right of reservation Indians to make their own laws and be ruled by those laws. White Mountain Apache v. Bracker (1980), 448 U.S. 136, 142, 100 S.Ct. 2578, 2583, 65 L.Ed.2d 665, 672. We adopted the White Mountain Apache test in First v. State Dep't of Social & Rehabilitation Servs. (1991), 247 Mont. 465, 471, 808 P.2d 467, 470.

In White Mountain Apache, the Supreme Court emphasized that traditional standards of preemption do not apply, for "the tradition of Indian sovereignty over the reservation must inform the determination whether the exercise of state authority has been pre-empted by operation of federal law." 448 U.S. at 143. Consequently, the Court required a "particularized inquiry into the nature of the state, federal, and tribal interests at stake," to determine whether, "in the specific context, the exercise of state authority would violate federal law." 448 U.S. at 145.

In conducting that inquiry here, we will address the federal, tribal and state interests involved in an apportionment of the Indian trust land that constitutes the Wellmans' only significant marital asset.

III

Indian trust property cannot be conveyed without the consent of the Secretary of the Interior. Tooahnippah v. Hickel (1970), 397 U.S. 598, 609, 90 S.Ct. 1316, 1323, 25 L.Ed.2d 600, 609. Further, the Quiet Title Act, 28 U.S.C. § 2409, gives the United States sovereign immunity as to Indian trust land; therefore,

8

actions to adjudicate title to trust land are barred in state and federal courts. Ducheneaux v. Secretary of Interior (8th Cir. 1988), 837 F.2d 340, 342-343, cert. denied, 486 U.S. 1055 (1988). Thus, an assertion of state court jurisdiction to apportion a marital estate consisting primarily of Indian trust land appears on its face to be in conflict with the federal government's direct interest in Indian trust property.

Robert attempts to circumvent this barrier by arguing that even though the District Court has no authority to transfer title to the trust land to a non-Indian, it has the power to value the marital estate and the obligation to apportion it equitably, either by awarding him a monetary judgment equal to his equitable share of the estate or by ordering the land to be sold to other tribal members and the proceeds divided. We disagree.

It is true that § 40-4-202(1), MCA, provides, in pertinent part, that in a proceeding for dissolution of marriage the court "shall . . . equitably apportion between the parties the property and assets belonging to either or both, however and whenever acquired and whether the title thereto is in the name of the husband or wife or both" (emphasis added). We note that here, neither party holds legal title to the Indian trust land. In any event, however, the strong federal and tribal interests in trust property mandate our conclusion that § 40-4-202(1), MCA, cannot be construed to require or allow adjudication of Indian trust land by a state district court. As the Blackfeet Tribal Law and Order Code provides for consummation of divorce in accordance with Montana

9

law, we presume that the Blackfeet Tribal Court will equitably apportion the Wellmans' marital assets as prescribed by § 40-4-202(1), MCA.

Any state action that affects ownership of Indian trust land is closely circumscribed by 28 U.S.C. § 1360(b), even where state jurisdiction has been acquired pursuant to P.L. 280. Section 1360(b) provides that:

> Nothing in this section [P.L. 280] shall authorize the alienation, encumbrance, or taxation of any real or personal property . . . belonging to any Indian or any Indian tribe . . . that is held in trust by the United States; . . . or shall confer jurisdiction upon the State to adjudicate, in probate proceedings or otherwise, the ownership or right to possession of such property or any interest therein.

On its face, this statute precludes state jurisdiction to adjudicate any interest in Indian trust land. In light of this statutory circumscription even where the state has assumed jurisdiction, we infer the complete absence of Congressional intent to authorize or allow a state that has not assumed jurisdiction to adjudicate Indian trust land in any way whatsoever. See Sheppard v. Sheppard (Idaho 1982), 655 P.2d 895, 921 (Bistline, J., dissenting).

Robert argues that Sheppard authorizes state jurisdiction over Indian trust land in a marital estate. He cites its conclusion that in a dissolution involving an enrolled tribal member and a non-Indian, the Indian spouse must compensate the non-Indian spouse for "his or her share of the community contributions that have gone into property that is held in trust or subject to a restraint on alienation by the federal government." Sheppard, 655 P.2d at 914.

10

The majority in Sheppard affirmed a district court order requiring the Indian wife to pay the non-Indian husband a substantial sum to offset the bulk of the real and personal property, including Indian trust land, awarded to the wife. The majority pointed out that the district court had done nothing to affect title to the property, which remained in the wife's name, and that it had determined the size of the monetary award by the amount of community funds used to pay for the property. Under these circumstances, the Idaho court held, the district court's action did not infringe on the authority of the federal government or on tribal sovereignty. Sheppard, 655 P.2d at 914-15.

We distinguish Sheppard on several grounds. First, Idaho, unlike Montana, assumed jurisdiction over enforcement of certain state laws and regulations in Indian country within the state, including laws and regulations concerning domestic relations, pursuant to P.L. 280. Sheppard, 655 P.2d at 907 (citing Idaho Code § 67-5101 (1963)). Second, Idaho is a community property state; Montana is not.

Finally, and more importantly, the decision of the Idaho court does not support Robert's position in the case before us. In Sheppard, neither the trial court nor the Idaho Supreme Court exercised jurisdiction over the Indian trust property by bringing the property before it for valuation. Instead, the Idaho court merely ordered the Indian spouse to reimburse the non-Indian spouse for his share of the community funds used to purchase the land.

Here, we are urged to assert state court jurisdiction over

11

Indian trust land by figuratively bringing it into state court for valuation prior to an ordered sale and division of proceeds or a monetary award equal to Robert's equitable share of the value of the land. Based on our discussion of 28 U.S.C. § 1360(b), above, we conclude that any of these actions would result in a prohibited adjudication of interests in Indian trust land. See Sheppard, 655 P.2d at 923 (Bistline, J., dissenting).

Robert also relies on Conroy v. Conroy (8th Cir. 1978), 575 F.2d 175, suggesting that it authorizes the District Court to order the "sale of beneficial title in the said Trust lands to permissible beneficiaries . . . e.g., other Blackfeet Indians." Robert misreads Conroy.

Conroy involved a divorce action between two members of the Oglala Sioux Tribe, who had accumulated, during their marriage, 1,700 acres of land held in trust by the United States in the name of the husband. The divorce action was filed in the Pine Ridge Indian Reservation Tribal Court, which granted the divorce and awarded the wife roughly half the land and cattle accumulated through the parties' joint efforts. The Eighth Circuit, affirming, upheld tribal court jurisdiction to divide the trust land. 575 F.2d at 183. Thus, Conroy provides authority for a tribal court to apportion beneficial interests in trust land in conjunction with a dissolution action between tribal members. It has no bearing on the issue of state court jurisdiction over Indian trust land.

Notwithstanding Robert's failure to present authority requiring us to reverse the District Court's decision, we conclude

12

by returning briefly to the White Mountain Apache test, which required us to conduct "a particularized inquiry into the nature of the state, federal, and tribal interests at stake" in determining whether, "in the specific context, the exercise of state authority would violate federal law." White Mountain Apache, 448 U.S. at 145.

There is no question but that the United States has a significant interest in matters relating to Indian tribes and reservations. Apart from its direct interest as legal owner of Indian trust land, the United States has a strong goal of encouraging tribal self-government. Numerous federal statutes express this goal. See New Mexico v. Mescalero Apache Tribe (1983), 462 U.S. 324, 335, 103 S.Ct. 2375, 2387, 76 L.Ed.2d 611, 621, citing the Indian Reorganization Act of 1934, the Indian Civil Rights Act of 1968, the Indian Self-Determination and Education Assistance Act of 1973, and the Indian Financing Act of 1974.

Nor can the interest of the Blackfeet Tribe in this matter be overstated. In general, of course, Indian tribes retain the power to regulate the domestic relations of their members, by virtue of their status as sovereign entities; in addition, a tribal court specifically has jurisdiction to adjudicate disputes over Indian trust land. Conroy, 575 F.2d at 181-182. Here, the Blackfeet Tribal Court has, and exercises, concurrent jurisdiction over the dissolution of Blackfeet tribal members' marriages, while the Blackfeet Tribe has a strong interest in safeguarding its members' beneficial interest in trust lands.

13

Unless the state interests at stake are sufficient to justify the assertion of state authority, state jurisdiction that is inconsistent or interferes with federal and tribal interests is preempted by operation of federal law. Mescalero Apache, 462 U.S. at 334. It is true that the State of Montana has an interest in ensuring the existence of a forum in which marital property located within its borders may be apportioned upon a dissolution of marriage. In the usual case, the state achieves this goal by providing access to its courts. Here, however, the state's interest is met by the availability of an alternative forum in the Blackfeet Tribal Court. In short, the state's interest in the property and proceedings at issue is inconsequential compared with the federal and tribal interests at stake.

We hold that, under the facts of this case, the District Court did not err in concluding that it lacked jurisdiction to adjudicate the disposition of the Indian trust land that was the parties' only significant marital asset.

Affirmed.

_____
Justice

We concur:

_____
Chief Justice

14

William E. Hunt Sr.

R.C. McDonough

_____

_____
Justices