No.   92-531

IN THE SUPREME COURT OF THE STATE OF MONTANA

1993

VERLIN F. WIPPERT and
LORETTA L. WIPPERT,

      Plaintiffs and Appellants,

-vs-

THE BLACKFEET TRIBE OF THE
BLACKFEET INDIAN RESERVATION,

      Defendant and Respondent.

FILED

AUG 2 5 1993

Ed Smith
CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:   District Court of the Ninth Judicial District,
               In and for the County of Glacier,
               The Honorable R. D. McPhillips, Judge presiding.

COUNSEL OF RECORD:

      For Appellant:

            Seldon S. Frisbee, Attorney at Law, Cut Bank
            Montana

      For Respondent:

            Jean Bear Crane, Attorney at Law, Blackfeet Legal
            Department, Browning, Montana

                             Submitted on Briefs:  June 10, 1993

                                   Decided:  August 25, 1993

Filed:

                                 _____
                                     Clerk

Justice John Conway Harrison delivered the Opinion of the Court.

Loretta and Verlin Wippert (Wipperts) appeal from an order of the Ninth Judicial District Court, Glacier County, granting the Blackfeet Tribe's motion to dismiss the Wipperts' claims, which originally took the form of a declaratory judgment action filed in the District Court in 1977. We affirm.

This is the Wipperts' third appeal to this Court. After the first appeal, we remanded the case to the District Court for further proceedings. Wippert v. Blackfeet Tribe (1982), 201 Mont. 299, 654 P.2d 512 (Wippert I). On remand, the District Court entered judgment for the Tribe and the Wipperts appealed again. We reversed. Wippert v. Blackfeet Tribe (1985), 215 Mont. 85, 695 P.2d 461 (Wippert II). The Tribe then moved to dismiss for lack of subject matter jurisdiction, leading to the appeal now before us (Wippert III).

Following is the history of this case so far as it is relevant to the subject of the present appeal and to the issue of subject matter jurisdiction.

Wippert I

In 1974 the Wipperts, who owned a 2,400-acre ranch on the Blackfeet Reservation, borrowed $46,773 from the Blackfeet Tribe. The loan was secured by "all cattle now owned or hereafter acquired by the [Wipperts]," and the security agreement provided that the debtors would have at least five days' notice of any sale of the collateral. The loan, plus interest at ten percent, was due on

2

November 1, 1975, but on that date the Wipperts had paid only $2,043 on the principal.

On March 8, 1976, the Tribe notified the Wipperts that they were in default and that the Tribe intended to have the cattle picked up and taken to market, pursuant to the security agreement. The Tribe moved the cattle to another ranch on March 12, 1976, to be held until they could be sold. On April 15, 1976, the Tribe obtained a judgment in the Blackfeet Tribal Court for $44,730, authorizing the Tribe to sell the cattle and apply the proceeds of the sale first to the cost of feeding and shipping the cattle, and second to the judgment balance. Notice of this judgment was filed with the Glacier County clerk and recorder on April 21, 1976.

The cattle were sold at public auction in Shelby, Montana, on April 19, 1976, for $38,400, of which $27,031 was applied to the principal balance due on the Wipperts' loan. Two months later, the Wipperts agreed to sell their ranch to a third party (the Robertsons), but when the Robertsons discovered the Tribe's notice of judgment they refused to accept title. The Wipperts then agreed to hold $20,000 from the sale of the property in an interest-bearing escrow account, pending release of the tribal court judgment. If necessary to clear the judgment, the money was to be used for that purpose; otherwise, it was to be returned to the Wipperts. Because of this agreement, a title insurance policy was issued without listing the tribal court judgment as an exception. The ranch was conveyed to the Robertsons on July 1, 1976.

On June 29, 1977, the Wipperts filed a declaratory judgment

3

action against the Tribe, the Robertsons, and the title company's agent, asking the District Court to quiet title to the real property in the Robertsons and to declare, among other things, that the Tribe had no right, title or interest in, nor any lien or encumbrance on the real property or the $20,000 escrow account. The complaint alleged that the Tribe's judgment was void as to the Wipperts because it was obtained through fraud and because the Wipperts had been deprived of their property--the collateral-- without due process of law.

In its answer, the Tribe counterclaimed for $17,172, the amount still due on the Wipperts' loan, and raised as an affirmative defense the District Court's lack of jurisdiction over the Blackfeet Tribe. The Tribe asserted that it had not consented to the District Court's jurisdiction and that as a federally recognized Indian tribe, it could not be subjected to suit without the express consent of Congress. The Wipperts moved to strike this defense on the grounds that the Tribe had not raised it in its first response to the complaint, which was a motion to dismiss for failure to state a cause of action, filed on July 14, 1977 and denied for lack of a supporting brief.

The District Court, by order dated September 19, 1977, granted the Wipperts' motion to strike the Tribe's affirmative defense, stating that the defense was waived as provided in Rules 12(g) and 12(h), M.R.Civ.P., "with one exception, should counsel for the Blackfeet Tribe be able to show the court that immunity from suit is applicable herein and not waived, and therefore ought to be

4

viewed as lack of jurisdiction over the subject matter rather than person, the defense will [be] and hereby remains available."

In November 1979, after a hearing on pre-trial motions, the District Court dismissed the title company's agent and ordered that the escrowed funds, which then amounted to $23,444, be placed in an interest-bearing money market certificate pending further order of the court. The court filed its findings of fact and conclusions of law on August 19, 1981.

In its 1981 memorandum, the District Court found that it had subject matter jurisdiction because the subject of the lawsuit was title to fee patent land; because it had jurisdiction to remove a cloud from title to such land; and because it had jurisdiction over the office of the Glacier County clerk and recorder, where the document purporting to create a lien against the land--the Tribe's tribal court judgment--had been filed.

The court also found that the "judgment record" filed by the Tribe in the Glacier County clerk and recorder's office was "invalid and void" as to the Wipperts and "expunged from this court's records," because it had not been reduced to judgment in the District Court. In general, the court determined, tribal court judgments are not entitled to full faith and credit in a state court because Article IV, Section 1 of the United States Constitution does not mention tribal court judgments. The court concluded, however, that if a state court were to rule that a tribal court judgment is invalid, it would "infringe on the right of reservation Indians to make their own laws and be guided by

them;" that the State of Montana should give effect to a tribal court judgment as a matter of comity; and that the Blackfeet Tribe therefore had "a valid and enforceable judgment" and did not need a valid lien to reach the escrow account.

Accordingly, the court entered judgment for the Tribe on September 17, 1981, awarding the Tribe $16,630 plus interest from the date of the tribal court judgment, attorney's fees in the amount of $4,566, and $23 in costs out of the escrowed funds. By then, the amount originally due the Tribe as a deficiency judgment had been reduced by amounts the Tribe had withheld from income from the Wipperts' 120 acres of trust land. The Wipperts appealed.

We affirmed in part, holding that neither a sister state nor an Indian tribe could enforce a judgment in a Montana court without instituting an action in district court, pursuant to § 26-3-203, MCA, but that even though the Tribe had not instituted such an action, the tribal court judgment was entitled to deference as a matter of comity. We also affirmed the District Court's award of judgment from the escrow fund, holding that the Wipperts, in their escrow agreement, had agreed that the fund could be used to satisfy any remaining tribal court judgment. Wippert I, 654 P.2d at 515. Because the District Court had merely adopted the Tribe's statement of the amount due from the Wipperts, however, we remanded the case for a hearing to determine the proper amount of the judgment.

Wippert II

On March 23, 1983, the District Court heard testimony on the proper amount of the judgment. The Wipperts claimed that they owed

6

the Tribe nothing because 128 bulls, cows, and calves should have been included in the sale but were unaccounted for, while the 220 animals that were sold would have produced a higher price if they had been sold in Great Falls rather than Shelby and in the fall rather than in the spring. The Wipperts also asserted that the Tribe had not complied with the notice requirements of § 30-9-504(3), MCA.

The District Court filed its findings of fact, conclusions of law, and judgment on March 28, 1984. It found that the Wipperts had presented no evidence showing that they did not owe the Tribe $17,172 at the time the Tribe filed its counterclaim, and that due to credit given for income from the Wipperts' trust land, only $14,330 was due and owing at the time of the March 24, 1983 hearing.

The court concluded in its 1984 judgment that the sale of the Wipperts' cattle was commercially reasonable, under § 30-9-507(2), MCA, because the reasonableness of a sale depends on the manner in which the sale is conducted, not the price received; that the steps taken by the Tribe to notify the Wipperts of the sale amounted to "actual notice" and met the requirements of § 30-9-504(3), MCA; and that it was authorized by §§ 30-9-504 and -511, MCA, to award reasonable attorney's fees.

The court therefore awarded the Tribe $14,331 plus interest from April 15, 1976, $13,465 in attorney's fees, and $23 in costs. On April 4, 1984, the court stayed execution pending the Wipperts' appeal.

7

We reversed, holding that the Tribe was required to provide reasonable notice of the sale of collateral and that under § 30-9-504(3), MCA, "reasonable notice" means at least five days' prior written notice of the time and place of sale. We concluded that the Tribe's letter of March 8, 1976, informing the Wipperts that it intended to proceed with foreclosure, did not satisfy the requirements of § 30-9-504(3), MCA, and held that failure to provide reasonable notice precluded issuance of a deficiency judgment for the Tribe. We remanded the matter to the District Court for further proceedings consistent with our opinion.

Wippert III

On March 26, 1985, the Wipperts filed a memorandum of costs and disbursements in the District Court, reporting total costs of $1,447 for Wippert I and Wippert II. The Tribe objected, pointing out that the Wipperts did not prevail in Wippert I and therefore should recover costs only for Wippert II. The Wipperts argued, in response, that they were the successful party in the litigation as a whole and therefore were entitled to recover their costs, pursuant to § 25-10-104, MCA.

On April 3, 1985, the District Court ordered the clerk of court to deliver to the Wipperts' attorney the funds that had been held in escrow since 1976. By then the original $20,000 deposit had accumulated a total of $13,444 in interest. On May 1, 1985, the court issued its findings of fact, conclusions of law, and judgment, vacating its previous judgments of September 17, 1981, and March 28, 1984, and restoring to the Wipperts $3,200 in trust

8

income withheld by the Tribe between April 1976 and March 1983 in partial satisfaction of its judgment against the Wipperts, plus interest from April 1976 to the date of the order. A subsequent order, dated May 8, 1985, denied the Tribe's objection to the Wipperts' bill of costs and made it payable forthwith.

In its May 1985 findings of fact and conclusions of law the court found that the tribal court's judgment was not properly filed in Glacier County records and did not become a lien or encumbrance against the Wipperts' real or personal property. Therefore, the court determined that, contrary to its September 1981 judgment, the Tribe had no claim to any part of the escrow account created in 1976, nor to the income from the Wipperts' trust land, and the Wipperts were entitled to possession of the escrow funds, plus interest, in their entirety, "free of any claim or possible claim of any of the defendants in this action."

Concluding that the Tribe was not entitled to judgment or relief as requested in its 1976 counterclaim, the District Court dismissed the counterclaim and set a hearing to establish the amount of money the Tribe had improperly withheld from the Wipperts' trust income since 1983. The court also ruled that both parties were entitled to attorney's fees, the Tribe because it had been forced to foreclose its security interest, and the Wipperts because they were "forced to secure the services of an attorney when the Tribe instituted this action in state court to obtain a deficiency judgment." Apparently the hearing to establish amounts due the Wipperts was never held.

9

As to jurisdiction, the court repeated in its May 1, 1985, order the following language from its September 1981 judgment:

> This court has jurisdiction (subject matter jurisdiction) based on the fact that the subject matter of this lawsuit is the <u>title to fee patent land</u>, and its jurisdiction to quiet the title thereto or remove a cloud from the title thereto. Furthermore, the cloud to be removed is a document filed in the office of the Glacier County Clerk and Recorder, over which this court has jurisdiction.

On June 11, 1985 the Tribe filed a motion to vacate the judgment pursuant to Rule 60(b)(4), M.R.Civ.P., based on its contention that the District Court lacked jurisdiction to order it to return the Wipperts' trust income, which it had collected within the exterior boundaries of the Blackfeet Reservation pursuant to the tribal court judgment of April 15, 1976.

No response to this motion appears in the record. Eighteen months later, on November 13, 1986, the Tribe filed a motion to dismiss the case "with prejudice and in its entirety," for lack of subject matter jurisdiction. This motion, which the District Court granted in October 1992, is the origin of the appeal now before us.

The Wipperts moved to strike the Tribe's motion to dismiss, contending that the District Court could not entertain a motion to dismiss after the time in which to appeal had expired, and that the Tribe, having asked the District Court in 1976 to enforce its tribal court judgment, could not now claim sovereign immunity.

The Tribe argued, in response, that it had not submitted to the court's jurisdiction but instead had filed a record of its tribal court judgment with the Glacier County clerk and recorder and had then been named a defendant in the Wipperts' declaratory

10

judgment action. Its counterclaim in that action merely requested that the tribal court judgment be paid out of the escrow account, which was the Wipperts' "only available remaining asset."

The District Court heard oral argument on the Wipperts' motion to strike on January 7, 1987. Counsel were asked to brief the issue of the Tribe's sovereign immunity, and both parties filed briefs within thirty days.

On October 10, 1992, the District Court granted the Tribe's motion to dismiss. In the memorandum accompanying its order, the court stated that tribal immunity is jurisdictional and is not waived by failure to raise it at trial or on appeal. Further, the court found that Indian tribes are sovereign entities, generally immune from suit, and that this immunity is co-extensive with that of the United States. "Thus, absent an express waiver or consent to suit," the court concluded, "this court has no jurisdiction."

The Wipperts appealed, raising three issues, which we have restated as follows.

> 1. Whether the District Court erred in considering a motion to dismiss filed eighteen months after the entry of a final judgment.

> 2. Whether the Tribe's 1986 motion to dismiss, and the District Court's order granting that motion, were barred by the doctrine of res judicata.

> 3. Whether the District Court erred in concluding that the Tribe did not waive sovereign immunity by acting in its corporate capacity.

The Tribe raises a fourth issue: whether, regardless of the Tribe's immunity, a state district court has subject matter jurisdiction over a civil matter involving the Blackfeet Tribe and

11

a tribal member and arising within the exterior boundaries of the Blackfeet Reservation. As we affirm the District Court's ruling, which was based on its conclusion that the Tribe is immune to suit, we need not decide whether the District Court otherwise lacked subject matter jurisdiction to declare whether the Tribe had an interest in or lien on the Wipperts' real or personal property. We note in passing, however, that because Montana has not assumed civil jurisdiction over causes of action arising on the Blackfeet Reservation, under P.L. 280 and the Indian Civil Rights Act, civil jurisdiction presumptively lies in the tribal court. See In re Marriage of Wellman (Mont. 1993), 852 P.2d 559, 50 St.Rep. 461, and the cases cited therein.

I

Did the District Court err in considering a motion to dismiss filed eighteen months after entry of judgment?

The District Court failed to act on the Tribe's timely motion for relief from judgment; therefore, that motion was deemed denied after forty-five days, or approximately on July 26, 1986, pursuant to Rule 60(c), M.R.Civ.P. Once a motion has been deemed denied, the court loses jurisdiction. In re Marriage of McKinnon (1992), 251 Mont. 347, 350, 825 P.2d 551, 553. Different rules apply, however, to the Tribe's motion to dismiss the entire action for lack of subject matter jurisdiction.

Jurisdiction--the right to determine and hear an issue-- transcends procedural considerations and involves the fundamental power and authority of the court itself. Corban v. Corban (1972),

12

161 Mont. 93, 504 P.2d 985. It is well settled that the issue of subject matter jurisdiction may be invoked at any time in the course of a proceeding, and that once a court determines that it lacks subject matter jurisdiction, it can take no further action in the case other than to dismiss it. Rule 12(h)(3), M.R.Civ.P.; In re Marriage of Lance (1984), 213 Mont. 182, 690 P.2d 979. See also Big Spring v. Blackfeet Tribe (1978), 175 Mont. 258, 573 P.2d 655 (in an action against the Blackfeet Tribe by one of its members, we vacated a default judgment and remanded for further proceedings because the district court had entered judgment without ruling on the Tribe's motion to set aside the default for deficient service and lack of subject matter jurisdiction).

Thus, the Tribe's 1986 motion to dismiss is not subject to any time constraint. The fact that it was filed eighteen months after judgment entered does not affect its validity, nor does the District Court's six-year delay in ruling on the motion deprive it of jurisdiction. We conclude that the District Court did not err in considering the Tribe's motion to dismiss the case for lack of subject matter jurisdiction or in ruling on it six years later.

II

Did the doctrine of res judicata bar the Tribe's 1986 motion to dismiss and the District Court's order granting that motion?

The Wipperts contend that the District Court's order of October 10, 1992, is barred by res judicata, but their argument actually addresses the Tribe's right to raise the issue of sovereign immunity in their 1986 motion to dismiss the case for

13

lack of subject matter jurisdiction.

The Wipperts cite Wellman v. Wellman (1982), 198 Mont. 42, 643 P.2d 573, in which we adopted the following rule from Royal Coachman Color Guard v. Marine Trading (Me. 1979), 398 A.2d 382, 384:

> Once there has been full opportunity to present an issue for judicial decision in a given proceeding, including those issues that pertain to a court's jurisdiction, the determination of the court in that proceeding must be accorded finality as to all issues raised or which fairly could have been raised, else judgments might be attacked piecemeal and without end.

The issue in Wellman was whether the district court properly dismissed the plaintiffs' 1981 quiet title action. The plaintiffs claimed that the same court's 1971 judgment, which designated one of the defendants the sole owner of the disputed property, was void because it granted relief beyond the scope of that defendant's pleading in the 1971 action. We concluded that the plaintiffs had had a full opportunity to litigate the voidness issue in 1971, when the court denied their motion to set aside default and judgment in favor of the defendant, and held that dismissal of the 1981 action was proper.

Here, the Wipperts assert that the Tribe's 1986 motion to dismiss is barred because the Tribe had an opportunity to raise the issue of sovereign immunity in Wippert I but failed to do so. The record shows, however, that the Tribe did raise sovereign immunity as a defense in 1977, in its answer to the Wipperts' original complaint. The District Court granted the Wipperts' motion to strike the defense but specifically reserved the issue of sovereign

14

immunity for later consideration, in its order of September 19, 1977.

At no time during the subsequent ten years did the Tribe have a "full opportunity" to litigate the issue of sovereign immunity. Although the District Court announced in its 1981 judgment, and repeated in its 1985 judgment, that it had jurisdiction to quiet title to fee patent land, and to "expunge" the record of tribal court judgment filed in the Glacier County clerk and recorder's office, it did not rule on the issue of the Tribe's immunity to suit until 1992. Thus the doctrine of res judicata, which is intended to prevent a party from relitigating a matter that he or she has already had an opportunity to litigate, Brault v. Smith (1984), 208 Mont. 21, 679 P.2d 236, does not apply in this case.

III

Did the District Court err in concluding that the Tribe did not waive sovereign immunity by acting in its corporate capacity?

Indian tribes have long been recognized as possessing the common-law immunity from suit traditionally enjoyed by sovereign powers, subject to the plenary control of Congress. Santa Clara Pueblo v. Martinez (1978), 436 U.S. 49, 58, 98 S.Ct. 1670, 1677, 56 L.Ed.2d 106, 115. Without tribal consent or congressional authorization, an Indian tribe is exempt from suit. United States v. U.S. Fidelity and Guaranty Co. (1940), 309 U.S. 506, 512, 60 S.Ct. 653, 656, 84 L.Ed. 894, 899. A tribe may consent to suit only by an unequivocally expressed waiver of its sovereign immunity. Santa Clara Pueblo, 436 U.S. at 58.

15

Other courts, following Santa Clara Pueblo, have endorsed the principle that an Indian tribe cannot waive its immunity by implication. In American Indian Agricultural Credit Consortium, Inc. v. Standing Rock Sioux Tribe (8th Cir. 1985), 780 F.2d 1374, for example, the Eighth Circuit overruled the district court's determination that the tribe had impliedly waived sovereign immunity in a contract action. "Nothing short of an express and unequivocal waiver," the Standing Rock court held, "can defeat the sovereign immunity of an Indian nation." 780 F.2d at 1379. See also Chemehuevi Indian Tribe v. California State Bd. of Equalization (9th Cir. 1985), 757 F.2d 1047, in which the Ninth Circuit decided that the tribe's initiation of a declaratory judgment action against a state agency did not constitute consent to the agency's counterclaim.

The Wipperts argue that the Tribe consented to suit in its corporate charter, ratified on August 15, 1936, which gave the Tribe the power "to sue and be sued in courts of competent jurisdiction." Federal courts of appeal, however, generally have concluded that a "sue and be sued" clause in a tribal corporate charter cannot serve as a waiver of sovereign immunity if the tribe acted only in its constitutional or governmental capacity. See, e.g., Ramey Construction Co., Inc. v. Apache Tribe of the Mescalero Reservation (10th Cir. 1982), 673 F.2d 315, which held that Ramey's breach of contract claims were properly dismissed based on the tribe's sovereign immunity, despite a "sue or be sued" clause in the tribe's corporate charter, because the tribe had acted as a

16

constitutional entity, not as a corporate entity.

The Wipperts contend that the Tribe waived its immunity in 1977 when it filed a claim, in federal as well as state court, for the $17,172 remaining unpaid after the sale of the collateral. In that claim the Tribe described itself as "a federally chartered corporation" organized pursuant to the Indian Reorganization Act of 1934, and stated that its credit committee, which had made the original loan to the Wipperts, had been organized as a part of its "corporate business."

The Tribe's view, as expressed in its January 1987 brief, is that in its transactions with the Wipperts, who were tribal members, it acted as a "political governing body," pursuant to section 16 of the Indian Reorganization Act. The chartered tribal corporation formed under section 17 of the Indian Reorganization Act is, the Tribe argues, a separate entity through which the tribal government conducts the business of the Tribe, as opposed to its governmental affairs.

According to the Tribe, its credit program is not a section 17 business venture but a means of promoting ranching and farming development by allowing tribal members to borrow specifically appropriated federal funds; earnings from these loans are not used as profit but instead are used to repay the federal government. Moreover, the credit program has no corporate capacity separate from the Tribe, which exercises direct authority over the program and the money it earns.

The District Court adopted the Tribe's view of its credit

17

program, finding that it "operates under the direct auspices of the Blackfeet tribal government" and "has no separate corporate capacity," and that the Tribe exercises direct authority over it. The court concluded that when the credit committee loaned the Wipperts money in 1974 it was acting as an instrumentality of the tribal government and therefore is immune from suit under the doctrine of sovereign immunity.

We agree. The Indian Reorganization Act of 1934 authorizes two distinct legal entities, one governed by a constitution and the other, by a corporate charter. 25 U.S.C. §§ 476, 477. Sovereign immunity applies to the constitutional entity but not to the corporate entity, for policy reasons succinctly described in Atkinson v. Haldane (Alaska 1977), 569 P.2d 151, 174-75:

> There is little doubt that the claims to sovereign immunity have been allowed in the courts in order to protect the limited and irreplaceable resources of the Indian tribes from large judgments. However, strict application of the immunity principle could severely retard the tribe's economic growth in a modern business world. Recognition of two legal entities, one with sovereign immunity, the other with the possibility for waiver of that immunity, would enable the tribes to make maximum use of their property. The property of the corporation would be at risk, presumably in an amount necessary to satisfy those with whom the tribe deals in economic spheres. Yet some of the tribal property could be kept in reserve, safe from a judgment execution which could destroy the tribe's livelihood, in recognition of the special status of the Indian Tribe.

Here, however, the Blackfeet constitution and corporate charter, taken together, do not in themselves create two distinct entities. First, the constitution, which was approved by the Secretary of the Interior in 1935 pursuant to section 16 of the Indian Reorganization Act, designates the Tribal Business Council

18

as the Tribe's governing body and authorizes it to delegate any of its powers to a subordinate body. Accordingly, the Tribal Council appoints and retains complete authority over the credit committee, which loaned money to the Wipperts and thus became a defendant in the Wipperts' 1976 declaratory judgment action.

Second, the Tribe's corporate charter, approved pursuant to section 17 of the Indian Reorganization Act, assigns to the Tribal Council corporate powers that include the authority to borrow money from the Indian Credit Fund and loan it to tribal members, as well as the power to sue and be sued in courts of competent jurisdiction. In assuming these powers, the Tribal Council did not waive its sovereign immunity in the express terms required by Santa Clara Pueblo, 430 U.S. at 58.

We hold that the District Court, having before it the Blackfeet constitution and corporate charter, did not err in finding that the credit committee is merely an instrumentality of the Tribal Council.

The Arizona Court of Appeals conducted a similar analysis in S. Unique, Ltd. v. Gila River Pima-Maricopa Indian Community (Ariz. App. 1983), 674 P.2d 1376. The court held that a commercial farm operated by the Pima-Maricopa Community, or tribe, shared the tribe's immunity because the farm was a subordinate economic organization of the tribe acting in its constitutional capacity. Responding to the appellant's assertion that the constitutional Pima-Maricopa Community should be distinguished, under the Indian Reorganization Act, from the Indian Corporation, the Arizona court

stated that:

> [t]he distinction to be made is not between commercial and governmental functions in order to determine the availability of the defense of tribal sovereign immunity. The fact that the Community was engaged in a proprietary function through the auspices of the [farm] is immaterial. The Community as the governmental organization of the tribe can, and in this case did, operate a commercial farming venture . . . as a subordinate economic organization of the Community. This does not waive tribal sovereign immunity.

674 P.2d at 1382.

We reach the same conclusion with respect to the status of the Blackfeet credit committee: it is, as the District Court correctly determined, a subordinate organization of the Tribal Council, to which the Tribal Council has delegated its authority to borrow money from the Indian Credit Fund and loan it to tribal members.

The Ninth Circuit specifically ruled on the issue of Blackfeet tribal immunity in a case involving a credit committee transaction. Kennerly v. United States (9th Cir. 1983), 721 F.2d. 1252. There, the credit committee asked the Bureau of Indian Affairs (BIA) to attach funds in tribal member Kennerly's Individual Indian Money account, as partial repayment of money Kennerly had borrowed from the tribe. The account contained income from Kennerly's trust land. The BIA transferred money from Kennerly's account to the tribe, and Kennerly brought an action against the tribe, members of the tribe's credit committee, and BIA officers to recover the money. Without distinguishing between the credit committee and the tribal government, the Ninth Circuit affirmed the district court's dismissal of the tribe on grounds of sovereign immunity.

20

Conclusion

The Blackfeet Tribe loaned the Wipperts a substantial sum of money and obtained a valid judgment in the Blackfeet Tribal Court after the Wipperts defaulted on the loan. We upheld the validity of that judgment in Wippert I, 654 P.2d at 515, and we reaffirm that holding now. As the Tribe made the loan in its constitutional capacity, it did not waive its immunity to the Wipperts' 1977 declaratory judgment action.

When the Wipperts asked the District Court to declare that the Tribe had no interest in or lien on any assets they possessed after the sale of their collateral, they were, in effect, attempting to prevent the Tribe from obtaining a lien, based on the deficiency judgment to which the Tribe appeared to be entitled, against the land they had sold to the Robertsons or the $20,000 fund set aside in conjunction with that sale. In the interest of protecting tribal assets--the money still owed by the Wipperts--the Tribe had no choice but to resist this declaration. It was then, in 1977, that the Tribe raised the legitimate defense of sovereign immunity, acknowledged at last by the District Court in its order of October 10, 1992.

We hold that the Tribe did not waive its immunity by loaning the Wipperts money or by defending the Wipperts' 1977 declaratory judgment action, and that the District Court did not err in dismissing the Wipperts' action against the Tribe for lack of subject matter jurisdiction, based on the Tribe's sovereign immunity. In reaching this conclusion, we do not overrule our

21

adoption, in _Wippert I_, of the rule that tribal court judgments are to be treated with the same deference shown decisions of foreign nations, as a matter of comity.

AFFIRMED.

_____
Justice

We concur:

_____
Chief Justice

_____
_____
_____
_____
Justices

Justice James C. Nelson did not participate in this decision.

Chief Justice J.A. Turnage specially concurred.

I concur in the majority opinion affirming the District Court for the reason that the District Court did not have subject matter jurisdiction. I do not agree with all that is, unnecessarily, said in the majority opinion.

_____
Chief Justice

22

August 25, 1993

## CERTIFICATE OF SERVICE

I hereby certify that the following order was sent by United States mail, prepaid, to the following named:

SELDON S. FRISBEE
Attorney at Law
P.O. Box 1998
Cut Bank, MT 59427-0547

amicusn

Jean Bear Crane, Attorney at Law
Blackfeet Legal Department
P. O. Box 849
Browning, MT 59417

JAMES C. NELSON
Attorney at Law
P.O. Box 428
Cut Bank, MT 59427

DARRELL T. PETERSON
Attorney at Law
Box 10
Cut Bank, MT 59427

Amicus Attorneys:

ED SMITH
CLERK OF THE SUPREME COURT
STATE OF MONTANA

BY: *M. Tudor*
Deputy