[No. 41123-3-I. Division One. May 3, 1999.]

*In the Matter of the Marriage of* SAMMY KAYE LANDAUER, *Appellant*, and EUGENE PAUL LANDAUER, *Respondent*.

*Raas, Johnson & Stuen, P.S.*, by *Patrick J. Lakey*, for appellant.

*Berger & Ivarinen, P.S.*, by *Kathryn E. Berger*, for respondent.

ELLINGTON, J. — State courts may not adjudicate ownership of Indian trust lands. In a dissolution proceeding between Sammy Landauer, a Nez Perce Indian, and Eugene Landauer, a non-Indian, the trial court first determined that a community property agreement converted Indian trust lands from separate property to community property, and then offset the value of the trust lands against other community property assets. But because the trial court lacked jurisdiction to adjudicate ownership of the Indian trust lands, it erred in characterizing the trust land as community property, and in offsetting its value against other property. The court may, however, consider the value of such property in determining the relative economic positions of the parties so as to arrive at a just and equitable division of the marital estate. We reverse and remand for further proceedings.

## Facts

Eugene Landauer and Sammy Landauer married in 1967. Over the course of their 30-year marriage, they acquired significant assets, including a Smith Barney account, a boat, a boathouse, and two IRA accounts.

Ms. Landauer is a Nez Perce Indian. Mr. Landauer is not Indian. During the marriage, Ms. Landauer inherited three parcels of Indian trust land from her mother: (1) an undivided two-thirds interest in 46.66 acres of land on the Muckleshoot Indian Reservation in King County, Washington; (2) two one-twenty-fourth (1/24) shares of property in Concrete, Washington; and (3) two one-one hundred-thirty-fifth (1/135) shares of property in Darrington, Washington.

In May 1984, the Landauers executed a community property agreement. The community property agreement included the following provision:

> All property in the State of Washington of whatsoever nature and description, whether real, personal or mixed, and now owned or hereafter acquired by them or either of them, including any separate property, shall be considered and is hereby declared to be community property, and each hereby conveys and quitclaims to the other his or her interest in any separate property he or she may now own or hereafter acquire in the State of Washington so as to convert the same to community property.

In 1996, Ms. Landauer filed for dissolution. The state trial court held that the 1984 community property agreement converted all separate property, including the Indian trust land, to community property.[1] The court asserted that it had the power either to divide the property between the parties or to make an offsetting financial award.

Both parties presented evidence regarding the appraised value of the trust property. Ms. Landauer's appraiser, Garrett Martin, testified that the entire Muckleshoot parcel was worth $380,000, but applied a 45 percent discount based on his understanding that Indian trust land cannot be sold without approval by the Bureau of Indian Affairs. Martin therefore concluded that Ms. Landauer's two-thirds interest was worth $139,000. Martin appraised Ms. Landauer's interest in the Concrete and Darrington properties at $11,000 and $700 respectively.

Mr. Landauer's appraiser, Gail Harmon, did not apply any discount for restrictions on alienation of trust land. He testified that Ms. Landauer's two-thirds interest in the Muckleshoot property was worth $327,500. Harmon did not know whether the sale of trust land required the approval of the Department of the Interior. The trial court

---

[1] The court stated, "So basically I have no choice in this matter. The property that is within the State of Washington was clearly intended by the parties to be community property at that time . . . . So I will consider for purposes of dividing the estate of the parties her property."

found Harmon to be the more credible witness because "Mr. Harmon is closer to the area, closer to circumstances down there and ha[s] a much better grasp of market value." Accordingly, the court valued the Muckleshoot property at $327,500 as appraised by Harmon. The court then offset the total value of the Muckleshoot, Concrete, and Darrington properties[2] against the value of the parties' Smith Barney account, and divided the remainder of the community property equally.

Ms. Landauer appeals the property distribution, challenging the trial court's assertion of jurisdiction over the Indian trust land, its offsetting of trust property against community property, and its reliance on Harmon's appraisal of the Muckleshoot trust land.

## Discussion

### A. State Courts Have No Jurisdiction Over Indian Trust Lands

■ The trial court's jurisdiction to adjudicate the ownership of Indian trust lands is a question of law, which we review de novo.[3]

In 1953, Congress passed Public Law 280, which conferred civil and criminal jurisdiction over Indians and Indian territory upon five states,[4] and permitted all other states to assume jurisdiction without tribal consent.[5] The State of Washington assumed partial, nonconsensual juris-

---

[2]Harmon did not appraise the Concrete and Darrington properties, and the court valued those properties based upon Martin's appraisal.

[3]See Monroe v. Soliz, 132 Wn.2d 414, 418, 939 P.2d 205 (1997).

[4]Pub. L. 83-280, 67 Stat. 588 (1953) (codified as amended in scattered sections of 18 U.S.C., 25 U.S.C., and 28 U.S.C.). The five states were California, Minnesota (except the Red Lake Reservation), Nebraska, Oregon (except the Warm Springs Reservation), and Wisconsin.

[5]See generally Carole Goldberg-Ambrose, Public Law 280 and the Problem of Lawlessness in California Indian Country, 44 U.C.L.A. L. Rev. 1405, 1406 (1997) ("[T]ribes neither requested nor approved of states' Public Law 280 jurisdiction; it was imposed upon them in order to relieve federal financial obligations and to address perceived 'lawlessness' on reservations.") (citing Bryan v. Itasca County, 426 U.S. 373, 379, 96 S. Ct. 2102, 48 L. Ed. 2d 710 (1976)).

diction under Public Law 280, including jurisdiction over domestic relations matters.[6] Washington's assumption of jurisdiction was upheld in *Washington v. Confederated Bands & Tribes.*[7]

Congress subsequently passed the Indian Civil Rights Act of 1968, which required tribal consent for all future assumptions of jurisdiction over Indian country.[8] Congress did not make the consent provision retroactive, however, so Washington retained partial jurisdiction as originally legislated.

Congress' grant of jurisdiction to state courts has several limitations. Of particular relevance here, Congress retained exclusive federal jurisdiction when Indian trust lands are at issue. Both 28 U.S.C. § 1360(b) and 25 U.S.C. § 1322(b) provide:

> *Nothing in this section* shall authorize the alienation, encumbrance, or taxation of any real or personal property . . . belonging to any Indian . . . that is held in trust by the United States or is subject to a restriction against alienation imposed by the United States; . . . or *shall confer jurisdiction upon the State to adjudicate, in probate proceedings or otherwise, the ownership or right to possession of such property or any interest therein.*

(Emphasis added.) The Washington legislature adopted language closely paralleling the federal statutory provisions.[9]

 The U.S. Supreme Court has broadly construed this

---

[6]RCW 37.12.010(3).

[7]439 U.S. 463, 502, 99 S. Ct. 740, 58 L. Ed. 2d 740 (1979).

[8]Pub. L. 90-284, Title IV, 82 Stat. 79 (1968) (codified as amended in scattered sections of 18 U.S.C., 25 U.S.C., and 28 U.S.C.).

[9]RCW 37.12.060 provides:

> Nothing in this chapter shall authorize the alienation, encumbrance, or taxation of any real or personal property . . . belonging to any Indian . . . that is held in trust by the United States or is subject to a restriction against alienation imposed by the United States; . . . or shall confer jurisdiction upon the state to adjudicate, in probate proceedings or otherwise, the ownership or right to possession of such property or any interest therein . . . .

restriction on state court jurisdiction. In *Bryan v. Itasca County*,[10] the Court held that the grant of jurisdiction did not include the power to tax, and observed that "the express prohibition of any 'alienation, encumbrance, or taxation' of any trust property can be read as prohibiting state courts, acquiring jurisdiction over civil controversies . . . from applying state laws or enforcing judgments in ways that would effectively result in the 'alienation, encumbrance, or taxation' of trust property." A community property agreement, otherwise valid under Washington law, thus cannot be enforced if its effect is the transfer of trust lands.

At least one state, however, distinguished *Bryan* for purposes of divorce and community property actions. In *Sheppard v. Sheppard*,[11] the Idaho Supreme Court declared that Public Law 280, as interpreted by *Bryan*, prohibited adjudication over state regulatory and taxing activities, but did not prohibit state jurisdiction "over divorce and community property actions." At issue in *Sheppard* was reimbursement to a non-Indian party for community contributions to the purchase of Indian trust lands. The *Sheppard* court held that federal preemption did "not prevent the courts of this state from requiring that one party to a marriage recompense the other party for his or her share of the community contribution that have gone into property that is held in trust . . . . No ownership of the property, equitable or legal, is being adjudicated."[12] The *Sheppard* court thus held that Public Law 280 grants jurisdiction to states that have assumed civil authority over domestic relations law, of which divorce and the division of community property are a part.[13]

---

[10] 426 U.S. 373, 391, 96 S. Ct. 2102, 48 L. Ed. 2d 710 (1976).

[11] 104 Idaho 1, 655 P.2d 895, 907 (1982).

[12] *Sheppard*, 655 P.2d at 914.

[13] *Id.*

In *In re Estate of Cross*,[14] the Washington Supreme Court answered a question certified by the U.S. Tax Court, and held that Washington community property law applies to determine property rights as between an enrolled member of the Puyallup tribe and his nonenrolled wife with respect to unincorporated business income derived from operation of a smokeshop on the Puyallup Indian Reservation. The *Cross* court did not consider a question involving trust lands or, indeed, any lands at all.

The trial court in the present case relied on the analysis provided by *Cross* and *Sheppard* in making its decision. *Sheppard* and *Cross* do not, however, control the question raised here. *Cross* held that community property law applied to property rights with respect to business *income* derived from the operation of a business on Indian land.[15] The issue in *Sheppard* was whether one party must recompense the other party for his or her share of *community contributions* toward purchasing property held in trust or subject to a restraint on alienation.[16] Neither case involved adjudication of ownership of trust lands.

■ Here, in contrast, the court adjudicated ownership of the trust property itself, by declaring that ownership of the Indian trust lands was conveyed to the community by the community property agreement.[17] In this the trial court exceeded the scope of its jurisdiction. The court thus erred in its characterization of the trust lands as community property.

---

[14]126 Wn.2d 43, 891 P.2d 26 (1995).

[15]*Cross*, 126 Wn.2d at 45.

[16]*Sheppard*, 655 P.2d at 914.

[17]A community property agreement ordinarily converts separate property to community property at the time of its execution. *See In re Marriage of Schweitzer*, 132 Wn.2d 318, 325, 937 P.2d 1062 (1997) (standard three-prong community property agreement converts separate property to community property at time of execution).

## B. Conveyance of Trust Lands Requires Approval by the Secretary of Interior

█ Even if the trial court had had subject matter jurisdiction to adjudicate ownership over trust lands, the court mischaracterized Ms. Landauer's property as community property for another reason as well: federal law prohibits the conveyance of Indian trust land without approval of the Secretary of the Interior.[18]

Courts have strictly construed this federal prohibition. For example, in *Black Hills Institute of Geological Research v. South Dakota School of Mines & Technology*, the Eighth Circuit determined than an attempted sale of Indian trust land, without securing prior approval of the Secretary, was void.[19] Similarly, in *Oglala Sioux Tribe v. United States*, the U.S. Claims Court noted that the language of 25 C.F.R. part 152 makes it "abundantly evident" that every step of the sale, exchange, or conveyance of Indian land is "subject to Secretarial approval."[20] Finally, in *Estate of McMaster*,[21] the Interior Board of Indian Appeals held that a community property agreement executed in Washington between a Quinault Indian and a non-Indian was null and void as to the alienation of trust property because the parties had not obtained the consent and approval of the Secretary of Interior.

Under federal law, Ms. Landauer could not convey this property, by community property agreement or otherwise,

---

[18]*See* 25 U.S.C. § 348 ("And if any conveyance shall be made of the lands set apart and allotted as herein provided, or any contract made touching the same . . . such conveyance or contract shall be absolutely null and void."); 25 U.S.C. § 464 ("[Restricted Indian lands] or interests may, with the approval of the Secretary of the Interior, be sold, devised, or otherwise transferred . . . ."); *see also* 25 C.F.R. § 152.17 ("[T]rust or restricted lands acquired by . . . inheritance . . . may be sold, exchanged, and conveyed by the Indian owner with the approval of the Secretary . . . ."); 25 C.F.R. § 152.22 ("Trust or restricted lands, . . . or any interest therein, may not be conveyed without the approval of the Secretary.").

[19]12 F.3d 737, 741 (8th Cir. 1993) (holding that purported sale of right to remove fossilized Tyrannosaurus Rex skeleton from land held in trust for Indian was void absent Secretary approval).

[20]21 Cl. Ct. 176, 188 (1990).

[21]5 I.B.I.A. 61, 69 (1976).

without the Secretary's approval. In the absence of such approval, the trust property she inherited remains her separate property.

## C. Economic Circumstances of the Parties: A Fair and Just Distribution of the Marital Estate

 The fact that the trial court cannot adjudicate ownership does not necessarily prevent a trial court from considering the existence and value of trust property in making its distribution of the marital estate. Ms. Landauer interprets Congress' preclusion of state jurisdiction to prohibit the dissolution court from even considering Indian trust lands as separate property when arriving at a just and equitable division. She relies upon *In re Marriage of Wellman*,[22] in which a Montana court considered a marital estate consisting primarily of Indian trust land. The non-Indian husband sought an award of a monetary judgment equal to his equitable share of the estate. Noting that Montana had not assumed jurisdiction under Public Law 280, that the Blackfeet Tribal Court had and would exercise jurisdiction, and that the Tribal Court would presumably make an equitable apportionment, the Montana Supreme Court held the state trial court had no jurisdiction to adjudicate Indian trust land "in any way whatsoever."[23]

 The *Wellman* court's analysis may be sound, but it has no application here. Unlike Montana, Washington has assumed jurisdiction under Public Law 280, and such jurisdiction includes domestic relations matters. Washington law requires the dissolution court to make a just and equitable distribution of property, and to consider the nature and extent of the separate property and the economic circumstances of the parties.[24] There is no requirement that the court have jurisdiction over the property itself.

---

[22]258 Mont. 131, 852 P.2d 559, 564 (1993).

[23]*Id.* (citing *Sheppard*, 655 P.2d at 921 (Bistline, J., dissenting)).

[24]RCW 26.09.080.

Ordinarily the court would consider all property, whether or not the court could effectively adjudicate ownership. We see nothing in Public Law 280 which prevents the court from considering the economic circumstances of each party in arriving at a just and equitable distribution of the marital estate.[25]

A somewhat analogous circumstance is presented by the federal law precluding state courts from dividing military disability retirement pay upon dissolution. In *In re Marriage of Kraft*,[26] our State Supreme Court considered the federal prohibition in light of state law requiring the trial court to make an equitable distribution of the parties' property in a just and equitable manner after considering the economic circumstances of each spouse at the time the division of property takes effect. In deciding how state courts should "honor both these requirements," the court held that while a state court may not directly offset the federal pay asset against other assets, it may consider future income as part of the economic circumstances of the parties.[27]

Similarly, here, directly offsetting the federal asset amounts to dividing it and thus violates the federal statute. The future economic circumstances of the parties may be affected by the asset's income potential or other value, however, and those circumstances are to be considered as part of a just and equitable distribution. On remand here, the court may not offset the value of trust lands directly against the parties' other property, but may consider its

---

[25]The Alaska Supreme Court considered this question and concluded that although it did not have authority to adjudicate title to Indian property, it should take into account the land's value as separate property as part of an assessment of the relative economic positions of the parties. *Foster v. Foster*, 883 P.2d 397, 401 & n.9 (Alaska 1994).

[26]119 Wn.2d 438, 832 P.2d 871 (1992).

[27]*Id.* at 447-48; *see also Mansell v. Mansell*, 490 U.S. 581, 109 S. Ct. 2023, 104 L. Ed. 2d 675 (1989) (addressing 10 U.S.C. § 1408(c)(1) (Uniformed Services Former Spouses Protection Act)).

future value to Ms. Landauer in making a just and equitable distribution.[28]

## D. Valuation of Indian Trust Lands

■ Ms. Landauer argues that the trial court erred by adopting the appraisal of Mr. Landauer's witness, whose valuation did not take into account the restraints on alienation of trust property. We agree.

Both experts' reports appraising the Muckleshoot property are "summary appraisals," and both evaluate the property against the same six comparable (non-reservation) properties. Both appraisers determined that the highest and best use of the property would be for residential subdivision. Martin and Harmon appraised the value of the entire parcel at $380,000 and $491,000 respectively.

The critical difference between the appraisals is that Martin discounted the value of Ms. Landauer's interest in recognition of the involvement of the Department of Interior, and the problems of fractional ownership. Martin testified that "[a] prospective purchaser would be unlikely to pay for two-thirds interest in the property without a discount because unanimous consent of all the holders of interests is required for any change in land use."[29] During Martin's testimony, a 1995 appraisal of the same property by the Federal Bureau of Indian Affairs was admitted for illustrative purposes. The BIA appraiser valued Ms. Landauer's share of the Muckleshoot property at $124,740, noting significant zoning restrictions imposed by the tribe which made it probable that "the subject property would only support a single homesite."[30]

■ In contrast, Harmon was unaware that the land was

[28]We note, however, that the court may well find such value de minimus, given the circumstances reflected by the record here.

[29]Ms. Landauer testified she did not know, and had been unable to locate, the six owners of the remaining one-third interest.

[30]The BIA appraiser reported that the tribe has zoned most of the property "conservancy," that residential use in a conservancy zone is permitted only with special use permits which are historically not granted, and that further, a bluff

trust land, or that the sale of trust land was subject to any restrictions. The market value of realty is measured by considering the benefits from the use of the property and the burdens placed upon it.[31] The "fair market value" of property is ordinarily the amount a willing buyer would pay a seller who is willing but not obligated to sell. Burdens include restrictions which may arise from zoning ordinances or other legal limitations on the use of land.[32] Harmon conceded that if an owner were unable to transfer his or her property, the property would have only "utility value," but no market value.

Under these circumstances, the court's acceptance of Harmon's appraisal amounted to disregarding factors relevant to value, including the effect of federal restraints on alienation. While the trial court has broad discretion in this area,[33] its discretion does not extend to completely overlooking factors material to the determination.

On remand, the trial court should reconsider its valuation of Ms. Landauer's Muckleshoot property in light of its unique status as trust lands to ensure an accurate picture of the extent to which it represents a valuable asset to Ms. Landauer such that it actually affects her future economic circumstances. The court may require additional expert testimony at its discretion.

Reversed and remanded for further proceedings consistent with this opinion.

COLEMAN and COX, JJ., concur.

Review denied at 139 Wn.2d 1002 (1999).

---

buffer zone and the tribe's Rural Residential zoning requirement of one residence per 10 acres would result in only one homesite.

[31]*Sahalee Country Club, Inc. v. Board of Tax Appeals*, 108 Wn.2d 26, 29, 735 P.2d 1320 (1987) (citations omitted).

[32]*Id.*

[33]*See In re Marriage of Crosetto*, 82 Wn. App. 545, 556, 918 P.2d 954 (1996).