**STATE OF MONTANA, Plaintiff,**

v.

**Toni A. GILHAM, individually and as Personal Representative of the Estate of Christine Marie Gilham, Defendant.**

No. 95–041–GF.

United States District Court,
D. Montana,
Great Falls Division.

July 8, 1996.

Joseph P. Mazurek, Harley R. Harris, Clay R. Smith, Office of the Montana Attorney General, Helena, MT, Maxon R. Davis, Paul R. Haffeman, Davis, Hatley, Haffeman & Tighe, P.C., Great Falls, MT, for State of Mont.

Turner C. Graybill, Graybill, Ostrem & Crotty, Great Falls, MT, Philip E. Roy, Roy Law Office, Great Falls, MT, for Toni A. Gilham.

## MEMORANDUM AND ORDER

HATFIELD, Senior District Judge.

### BACKGROUND

The above-entitled matter has its genesis in a single-vehicle accident which occurred on January 14, 1986, and resulted in the death of Christine Marie Gilham. The accident occurred at the intersection of U.S. Highways Nos. 2 and 89, located west of Browning, Montana, within the exterior boundaries of the Blackfeet Indian Reservation.

On March 21, 1986, plaintiff Toni A. Gilham, in her individual capacity and as the Personal Representative of the Estate of Christine Marie Gilham, instituted an action in the District Court for the Ninth Judicial District of the State of Montana, seeking monetary compensation as against the driver of the vehicle[1] and the State of Montana, for damages resulting from the accident. *Gilham, et al. v. State of Montana, et al.*, No.

DV–86–030. Gilham's complaint alleged, *inter alia*, the State of Montana acted in a negligent manner with respect to the design, construction and maintenance of the intersection of U.S. Highways Nos. 2 and 89.

On July 15, 1987, Gilham filed an action in the Blackfeet Tribal Court, seeking monetary compensation for damages resulting from the accident. *Gilham, et al., v. State of Montana*, No. 87–CA–377. Gilham's complaint alleged, *inter alia*, the State of Montana's negligence was a proximate cause of the underlying accident and the resultant damages.

The State of Montana entered a special appearance in Tribal Court, for the purpose of filing a motion to dismiss for lack of jurisdiction. The Tribal Court denied the State of Montana's jurisdictional challenge, and the case proceeded to trial. The Blackfeet Tribal Court jury rendered a verdict apportioning liability equally between the State of Montana and Eric Mattson, and awarded damages totalling $280,000.00, including $16,000.00 to Toni Gilham in her individual and representative capacity. Gilham filed a post-trial motion challenging the damage award, and was granted a new trial on the issue of damages in her individual capacity.

The Blackfeet Tribal Court of Appeals subsequently affirmed the Tribal Court's order denying the State of Montana's jurisdictional challenge. Thereafter, the State of Montana filed an appeal with the Blackfeet Supreme Court. On November 22, 1994, the Blackfeet Supreme Court entered its decision, affirming the Tribal Court's exercise of adjudicatory jurisdiction over the State of Montana. In addition, the Blackfeet Supreme Court remanded the matter to Tribal Court for "rehearing on the issue of wrongful death and survival claim damages."

On April 14, 1995, the State of Montana instituted the above-entitled action for declaratory relief, challenging the jurisdiction of the tribal court in the underlying action. The State of Montana also sought injunctive

---

1. The driver of the vehicle, Eric Mattson, was speeding at the time of the accident and had a blood alcohol level of approximately .20. Mattson was subsequently charged and convicted of involuntary manslaughter for the death of Christine Marie Gilham. *See, United States v. Eric Mattson*, Cause No. CV–86–12–GF (D.Mont. 1986).

relief prohibiting Gilham from subjecting the State to further proceedings in tribal court pending disposition of the above-entitled action. In response, Gilham filed a counterclaim requesting, *inter alia,* an order requiring the State of Montana to "accept, honor, abide and ultimately pay the damages ultimately assessed" in the underlying tribal court action.

Presently before the court are the parties' cross motions for summary judgment, pursuant to Fed.R.Civ.P. 56, on the issue of whether the Blackfeet Tribal Court was vested with jurisdiction to adjudicate the underlying tort action as against the State of Montana.[2] The dispositive issue, as framed by the parties' summary judgment motions, is whether Article II, Section 18 of the Montana Constitution[3] constitutes an express waiver of Montana's sovereign immunity with respect to tort actions commenced in tribal court. The Blackfeet Supreme Court, in upholding the tribal court's exercise of adjudicatory jurisdiction, stated:

Thus, the State of Montana has expressly waived [by virtue of Article II, Section 18]

its immunity from suit and has consented to be sued. Nowhere in the Montana Constitution does the State limit itself to be sued only in its own courts. For instance, the federal court may assert jurisdiction of Montana under certain circumstances.

Here, the unfortunate accident happened on the Blackfeet Indian Reservation. We find no reason to deny jurisdiction to the Blackfeet Tribal Court solely because the State of Montana is a party to the action. In fact, the record shows that this case was tried and decided under Montana law. All parties except the State of Montana are Indian, living on the reservation, and the accident occurred inside the reservation.

■ The question of whether an Indian Tribe retains the authority to compel a non-Indian to submit to the jurisdiction of a tribal court presents a question of federal law, properly determined by the federal courts; the final arbiters of federal law. *National Farmers Union Ins. Cos. v. Crow Tribe of Indians,* 471 U.S. 845, 852, 105 S.Ct. 2447, 2451–52, 85 L.Ed.2d 818 (1985).[4] According-

**2.** On February 14, 1996, Gilham requested the Blackfeet Tribal Court to reschedule a damage trial in the underlying action, in accordance with the decision of the Blackfeet Supreme Court. On March 7, 1996, the Tribal Court, over the objection of the State of Montana, issued a scheduling order resetting the underlying action for trial commencing on June 4, 1996.

On May 31, 1996, this court, cognizant of the trial setting in the Blackfeet Tribal Court, issued an order in the above-entitled action granting the State of Montana's motion for summary judgment with respect to the jurisdictional issue posed by the parties' cross motions for summary judgment. The present memorandum serves to explain the basis for the court's May 31, 1996, order.

The parties subsequently requested the court to clarify its May 31, 1996, memorandum and order. Specifically, the parties requested the court to clarify whether the State of Montana's request for injunctive relief, *i.e.,* to restrain Toni Gilham from pursuing her claims against the State of Montana in the tribal court action, *Gilham, et al., v. State of Montana,* Blackfeet Tribal Court No. 87–CA–377, had been granted. On June 3, 1996, the court entered a memorandum and order, which stated:

The court, having concluded the Blackfeet Tribal Court was not vested with jurisdiction to adjudicate the underlying tort action against the State of Montana, is constrained to con-

clude the underlying action, *Gilham, et al., v. State of Montana,* Blackfeet Tribal Court No., 87–CA–377, is necessarily enjoined. Accordingly, the State of Montana's request for injunctive relief is hereby GRANTED with respect to the further prosecution of *Gilham, et al., v. State of Montana,* Blackfeet Tribal Court No., 87–CA–377, in the Blackfeet Tribal Court.

**3.** Article II, Section 18 of the Montana Constitution provides, in pertinent part:

The state, counties, cities, towns, and all other local governmental entities shall have no immunity from suit for injury to a person or property, except as may be specifically provided by law by a two-thirds vote of each house of the legislature.

**4.** *National Farmers Union* involved a suit brought in Crow Tribal Court by Leroy Sage, a Crow Indian minor, against a Montana school district for injuries suffered when he was struck by a motorcycle on school grounds owned by the State of Montana within the boundaries of the Crow Indian Reservation. The Supreme Court expressly declined the opportunity to address tribal courts' civil jurisdiction over reservation-based causes of action involving Indian plaintiffs and non-Indian defendants. *National Farmers Union,* 471 U.S. at 854, 105 S.Ct. at 2452–53. Rather, the Court held the question of whether the tribe's retained sovereignty included the power to compel a non-Indian to submit to the juris-

ly, the issue of whether the Blackfeet Tribal Court possessed jurisdiction over the underlying action is ripe for review before this court, in the exercise of its federal question jurisdiction under 28 U.S.C. § 1331, given the fact that all avenues of potential relief in the tribal court system have been exhausted by the State of Montana with respect to its jurisdictional challenge.

## DISCUSSION

### I.

Sovereign immunity is a common law doctrine which precludes litigation against an unconsenting government. RESTATEMENT (Second) OF TORTS § 895B (1979). Sovereign immunity exists to preserve the resources of the government and to protect the government from undue influence by the judiciary.[5] See, Edelman v. Jordan, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1973); United States v. Lee, 106 U.S. 196, 206, 1 S.Ct. 240, 248–49, 27 L.Ed. 171 (1882).

The concept of sovereign immunity "goes to the very heart of [the] federal sys-tem and affect[s] the allocation of power between the United States and the several States." C. Wright, THE LAW OF FEDERAL COURTS 286 (1983). See also, Kawananakoa v. Polyblank, 205 U.S. 349, 353, 27 S.Ct. 526, 527, 51 L.Ed. 834 (1906).

It is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent. This is the general sense and the general practice of mankind; and the exemption, as one of the attributes of sovereignty, is now enjoyed by the government of every State in the Union. Unless, therefore, there is a surrender of this immunity in the plan of the convention, it will remain with the States....

Monaco v. Mississippi, 292 U.S. 313, 324, 54 S.Ct. 745, 748, 78 L.Ed. 1282 (1933), quoting, THE FEDERALIST No. 81 (Alexander Hamilton).

Although related, the concepts of common law sovereign immunity and immunity under the Eleventh Amendment[6] to the United States Constitution are doctrinally distinct.[7] "The Eleventh Amendment repre-

---

diction of its courts must be answered by federal law, which may have divested the tribe of such power, and therefore was a federal question included within the jurisdiction of the federal district courts. Id. at 852–53, 105 S.Ct. at 2451–52. The Court did not, however, address the issue of whether the Crow Tribe had jurisdiction over the underlying tort claim. Rather, the Court left the issue for a separate inquiry, stating:

> [T]he existence and extent of a tribal court's jurisdiction will require a careful examination of tribal sovereignty, the extent to which that sovereignty has been altered, divested, or diminished, as well as a detailed study of relevant statutes, Executive Branch policy as embodied in treaties and elsewhere, and administrative or judicial decisions.

Id. at 855–56, 105 S.Ct. at 2453. Nonetheless, considerations of comity, predicated upon the well-recognized congressional policy of promoting tribal self-government and self-determination, compelled the Court to announce a rule of exhaustion, which requires tribal court remedies to be exhausted before the question of tribal jurisdiction is addressed by the federal courts. Id. at 856–57, 105 S.Ct. at 2453.

5. The principal public policy considerations cited in support of the doctrine of sovereign immunity include:

> (1) the public treasury must be protected from excessive encroachments;

> (2) orderly government administration would be disrupted if the state could be sued at the instance of every citizen;
> (3) governmental decisionmaking requires flexibility and discretion; and
> (4) separation of powers concerns prohibit the judicial branch from interfering with the discretionary functions of the legislative or executive branches absent a violation of a constitutional or statutory right.

Gerald T. Wetherington & Donald I. Pollock, Tort Suits Against Governmental Entities in Florida, 44 Fla.L.Rev. 1, 8 (1992).

6. The Eleventh Amendment provides:

> The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another state, or by citizens or subjects of any foreign state.

U.S. Const. amend. XI.

7. The Supreme Court has at times attempted to clarify and illustrate the distinction. See, Blatchford v. Native Village of Noatak, 501 U.S. 775, 786 n. 4, 111 S.Ct. 2578, 2585 n. 4, 115 L.Ed.2d 686 (1991) ("The fact that Congress grants jurisdiction to hear a claim does not suffice to show Congress has abrogated all defenses to that claim."); Pennsylvania v. Union Gas Co., 491 U.S. 1, 33, 109 S.Ct. 2273, 2298, 105 L.Ed.2d 1 (1989) ("The evidence is strong that the jurisdic-

sents a restraint upon the federal judicial power to hear suits against an unconsenting state, whereas the doctrine of sovereign immunity goes to the question of whether the sovereign may be sued at all." *United States v. Mottolo*, 605 F.Supp. 898, 910 (D.N.H. 1985). *See also, Hufford v. Rodgers*, 912 F.2d 1338, 1340–41 (11th Cir.1990); *Ramah Navajo School board, Inc., v. Bureau of Revenue*, 104 N.M. 302, 720 P.2d 1243, 1248 (App.1986).

The history of the Eleventh Amendment confirms the notion that the States entered the Union with their sovereignty intact. In 1793, the United States Supreme Court, in *Chisholm v. Georgia*, 2 U.S. (2 Dall.) 419, 447, 1 L.Ed. 440 (1793), concluded the Constitution did not incorporate the several states' common-law sovereign immunity into the federal system and, as a result, held a state could be sued in federal court, without its consent, for monetary damages by citizens of another state. In response to *Chisholm*, the states, fearing suits to collect unpaid war debts and to recover property seized during the Revolutionary War, extended state sovereign immunity into the federal court system by ratifying the Eleventh Amendment in 1795. *See,* Katharine F. Nelson, *Resolving Native American Land Claims and the Eleventh Amendment: Changing the Balance of Power*, 39 Vill.L.Rev. 525 (1994). *See also, Monaco v. Mississippi, supra,* 292 U.S. at 325, 54 S.Ct. at 749; *Welch v. Texas Dept. of Highways and Pub. Transp.,* 483 U.S. 468, 484, 107 S.Ct. 2941, 2951, 97 L.Ed.2d 389 (1987).

Although the Eleventh Amendment overruled the particular result in *Chisholm*, the Supreme Court has since "recognized that its [the Eleventh Amendment's] greater significance lies in its affirmation that the fundamental principle of sovereign immunity limits the grant of judicial authority in Art. III." *Pennhurst State School & Hospital v. Hald-*

*erman*, 465 U.S. 89, 98, 104 S.Ct. 900, 906, 79 L.Ed.2d 67 (1983).

That a State may not be sued without its consent is a fundamental rule of jurisprudence having so important a bearing upon the construction of the Constitution of the United States that it has become established by repeated decisions of this court that the entire judicial power granted by the Constitution does not embrace authority to entertain a suit brought by private parties against a State without consent given: not one brought by citizens of another State, or by citizens or subjects of a foreign State, because of the Eleventh Amendment; and not even one brought by its own citizens, because of the fundamental rule of which the Amendment is but an exemplification.

*Id.* at 98–99, 104 S.Ct. at 907, *quoting, Ex parte State of New York*, 256 U.S. 490, 497, 41 S.Ct. 588, 589, 65 L.Ed. 1057 (1921).

The Supreme Court's unanimous decision in *Hans v. Louisiana*, 134 U.S. 1, 13, 10 S.Ct. 504, 506, 33 L.Ed. 842 (1890),[8] firmly established that the Eleventh Amendment embodies a broad constitutional principle of sovereign immunity. *Welch, supra,* 483 U.S. at 486, 107 S.Ct. at 2952–53. In *Hans,* the Court determined state immunity was not restricted by the text of the Eleventh Amendment, but was "inherent in the nature of [state] sovereignty" that existed at the time the Constitution was ratified. *Hans, supra,* 134 U.S. at 13, 10 S.Ct. at 506. Accordingly, the Court determined the principle of sovereign immunity comes not from the words of the Constitution, but is inherent in the constitutional plan. *Monaco v. Mississippi, supra,* 292 U.S. at 322–23, 54 S.Ct. at 747–48.

In *Seminole Tribe of Florida v. State of Florida,* —— U.S. ——, 116 S.Ct. 1114, 134

---

tional grants in Article III of the Constitution did not automatically eliminate underlying state sovereign immunity....") (Scalia, J., concurring). *See also, Jicarilla Apache Tribe v. Hodel,* 821 F.2d 537, 539 (10th Cir.1987) ("[T]erms of [a sovereign's] consent to be sued in any court define that court's jurisdiction to entertain the suit.") (*quoting, United States v. Testan,* 424 U.S. 392, 399, 96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1976)).

8. In *Hans,* a citizen of Louisiana instituted an action against the State of Louisiana in federal court, asserting the State's failure to pay interest on certain bonds violated the Contract Clause. The Court unanimously concluded Louisiana was immune from suit in federal court, even though the text of the Eleventh Amendment prohibits only suits by noncitizens. *Hans, supra,* 134 U.S. at 21, 10 S.Ct. at 509.

L.Ed.2d 252 (1996), the United States Supreme Court reaffirmed the principles outlined in *Hans.*

> Although the text of the [Eleventh] Amendment would appear to restrict only the Article III diversity jurisdiction of the federal courts, "we have understood the Eleventh Amendment to stand not so much for what it says, but for the presupposition ... which it confirms." *Blatchford v. Native Village of Noatak,* 501 U.S. 775, 779 [111 S.Ct. 2578, 2581, 115 L.Ed.2d 686] (1991). That presupposition, first observed over a century ago in *Hans v. Louisiana,* 134 U.S. 1 [10 S.Ct. 504, 33 L.Ed. 842] (1890), has two parts: first, that each State is a sovereign entity in our federal system; and second, that '[i]t is inherent in the nature of sovereignty not to be amendable to the suit of an individual without its consent.' *Id.* at 13 [10 S.Ct. at 506].... *See also, Puerto Rico Aqueduct and Sewer Authority v. Metcalf & Eddy, Inc.,* [506 U.S. 139, 146, 113 S.Ct. 684, 689, 121 L.Ed.2d 605 (1993)] ("The Amendment is rooted in a recognition that the States, although a union, maintain certain attributes of sovereignty, including sovereign immunity"). For over a century we have reaffirmed that federal jurisdiction over suits against unconsenting States "was not contemplated by the Constitution when establishing the judicial power of the United States." *Hans, supra,* 134 U.S. at 15 [10 S.Ct. at 509].

*Seminole Tribe, supra,* —— U.S. at ——, 116 S.Ct. at 1122, 134 L.Ed.2d at 265 (citations omitted).

## II.

 The doctrine of sovereign immunity plays a vital role in our federal system, given the problems "inherent in making one sovereign appear against its will in the courts of the other." *Welch, supra,* 483 U.S. at 486–87, 107 S.Ct. at 2953, *quoting, Employees v. Missouri Dept. of Public Health and Welfare,* 411 U.S. 279, 294, 93 S.Ct. 1614, 1622, 36 L.Ed.2d 251 (1973) (MARSHALL, J., concurring in result). Accordingly, "[T]he contours of state sovereign immunity are determined by the structure and requirements of the federal system." *Id.* at 487, 107 S.Ct. at 2953.

> The rationale has been set out most completely in the Court's unanimous opinion, per Chief Justice Hughes, in *Monaco v. Mississippi,* 292 U.S. 313 [54 S.Ct. 745, 78 L.Ed. 1282] (1934). First, the United States may sue a State, because that is "inherent in the Constitutional plan." *Id.* at 329 [54 S.Ct. at 750]. Absent such a provision, "the permanence of the Union might be endangered." *Ibid.* (quoting *Oklahoma v. Texas,* 258 U.S. 574, 581 [42 S.Ct. 406, 409, 66 L.Ed. 771] (1922)). Second, States may sue other States, because a federal forum for suits between States is "essential to the peace of the Union." *Monaco v. Mississippi, supra,* at 328 [54 S.Ct. at 751]. Third, States may not be sued by foreign states, because "[c]ontroversies between a State and foreign State may involve international questions in relation to which the United States has a sovereign prerogative." 292 U.S. at 331 [54 S.Ct. at 751]. Fourth, the Eleventh Amendment established "an absolute bar" to suits by citizens of other States or foreign states. *Id.,* at 329 [54 S.Ct. at 751]. Finally, "[p]rotected by the same fundamental principle [of sovereign immunity], the States, in the absence of consent, are immune from suits brought against them by their own citizens...."

*Id.*

 In certain instances, however, a state's consent to suit is deemed implicitly given at the time the state joined the Union and adopted the United States Constitution. *See, Blatchford v. Native Village of Noatak,* 501 U.S. 775, 111 S.Ct. 2578, 115 L.Ed.2d 686 (1991). This type of implied consent, *i.e.,* a consent inherent in "the plan of the convention,"[9] has been relied upon by the Supreme

---

9. Under the "plan of convention" theory, states are deemed to have impliedly waived some of their sovereignty when they ratified the Constitution. *See, Monaco v. Mississippi, supra,* 292 U.S. at 322–23, 54 S.Ct. at 748 ("States of the Union, still possessing attributes of sovereignty, shall be immune from suits, without their consent, save where there has been *'a surrender of this immunity in the plan of the convention.'* ") (emphasis added). The theory recognizes that in order for

Court to allow states to be sued in federal court by the United States and by other states. *See, United States v. Texas,* 143 U.S. 621, 12 S.Ct. 488, 36 L.Ed. 285 (1892); *South Dakota v. North Carolina,* 192 U.S. 286, 24 S.Ct. 269, 48 L.Ed. 448 (1904). Relying on the same reasoning, the Supreme Court held foreign nations cannot sue States in federal court because foreign nations were not involved in the political framework of the Constitution. *Monaco v. Mississippi, supra,* 292 U.S. at 331–32, 54 S.Ct. at 751–52.

In *Blatchford v. Native Village of Noatak,*[10] the Supreme Court, in holding the Eleventh Amendment precluded suits by Indian tribes against unconsenting states, rejected the argument that the states had waived their immunity from suit by Indian tribes when they adopted the Constitution. *Blatchford, supra,* 501 U.S. at 779, 111 S.Ct. at 2581. Relying upon *Monaco v. Mississippi, supra,* the Court held a state's sovereign immunity extends to both individuals and sovereigns, and that any surrender of immunity is determined by the plan of convention. *Id.* at 780–81, 111 S.Ct. at 2581–82. The Court found nothing to suggest a surrender of immunity among states and tribes was inherent in the plan of convention. *Id.* at 779, 111 S.Ct. at 2581.

▮ In so holding, the Court found it inconsistent that the states would surrender their immunity to Indian tribes without a mutual concession from the tribes. *Id.* at 782, 111 S.Ct. at 2582–83. Moreover, the Court concluded the states and tribes could not have mutually ceded their respective sovereign immunities[11] because the tribes were not part of the Constitutional Convention. *Id.* at 782, 111 S.Ct. at 2582–83. Therefore, because the "plan of the convention" did not surrender the tribes' immunity to the states, it could not surrender the states' immunity to the tribes. *Id.*

Finally, the Court rejected the argument that Indian tribes are more like states than foreign nations, for waiver of immunity purposes, and should therefore be allowed to sue states in federal court.

The relevant difference between States and foreign sovereigns, however, is not domesticity, but the role of each in the convention within which the surrender of immunity was for the former, but not for

---

the constitutional system to function, a relationship of reciprocal rights and responsibilities was necessarily imposed upon the states when they joined the Union. The states ceded some aspects of their sovereign immunity to the federal government, but they did not relinquish their sovereign immunity as against entities other than the United States and sister states. *Blatchford, supra,* 501 U.S. at 781, 111 S.Ct. at 2582. In ratifying the Constitution, the states made a mutual concession to be sued by other states. *Id.* at 782, 111 S.Ct. at 2582–83. As a result, a state's implicit waiver of sovereign immunity as to suits by the United States or "sister states" is predicated upon the "mutuality of concession" inherent in the formation of the Union. *Id.*

10. In *Blatchford,* the Native Village of Noatak sued the Commissioner of Alaska's Department of Community and Regional Affairs for including non-native communities in a revenue-sharing program which the legislature authorized for Eskimo communities. 501 U.S. at 778, 111 S.Ct. at 2580–81. By expanding the class of communities eligible to receive the state aid, the Commissioner's action reduced the aid available to Eskimo communities. *Id.* The Village sued the Commissioner in federal court, seeking to compel the Commissioner to provide the funds that they would have received had the class of eligible communities not been enlarged. *Id.*

11. Federally recognized Indian tribes enjoy common law immunity from suit traditionally enjoyed by sovereign powers. *See, Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 58, 98 S.Ct. 1670, 1676–77, 56 L.Ed.2d 106 (1978); *Pit River Home and Agr. Co-op Assoc. v. United States,* 30 F.3d 1088, 1100 (9th Cir.1994). According to the Supreme Court, tribal sovereign immunity springs from the "inherent powers of a limited sovereignty which has never been extinguished." *Santa Clara Pueblo v. Martinez, supra,* 436 U.S. at 58, 98 S.Ct. at 1676–77. "Indian tribes are 'domestic dependent nations' that exercise inherent sovereign authority over their members and territories. Suits against Indian tribes are thus barred by sovereign immunity absent a clear waiver by the tribe or congressional abrogation." *Pit River Home, supra,* 30 F.3d at 1100, *quoting, Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Oklahoma,* 498 U.S. 505, 509, 111 S.Ct. 905, 909, 112 L.Ed.2d 1112 (1991). *See also, Pan Am. Co. v. Sycuan Band of Mission Indians,* 884 F.2d 416, 418 (9th Cir.1989) ("Absent congressional or tribal consent to suit, state and federal courts have no jurisdiction over Indian tribes; only consent gives the courts the jurisdictional authority to adjudicate claims raised by or against tribal defendants.").

the latter, implicit. What makes the States' surrender of immunity from suit by sister States plausible is the mutuality of that concession. There is no such mutuality with either foreign sovereigns or Indian tribes.

*Blatchford,* 501 U.S. at 779, 111 S.Ct. at 2581.

The Supreme Court's mutuality analysis in *Blatchford* was, in all likelihood, prompted by its decision, rendered almost simultaneously with *Blatchford,* in *Oklahoma Tax Commission v. Potawatomi Indian Tribe,* 498 U.S. 505, 111 S.Ct. 905, 112 L.Ed.2d 1112 (1991). In *Potawatomi,* the tribe filed suit in federal court to enjoin the State of Oklahoma from collecting unpaid taxes on cigarettes sold at a convenience store owned and operated by the tribe on trust land. The State filed a counterclaim seeking to enforce its tax claim, and to enjoin the tribe from selling cigarettes without collecting and remitting state taxes. The Supreme Court held the tribe's sovereign immunity precluded the State from pursuing a claim for past unpaid taxes, but that the State could collect taxes from future sales to non-Indians. *Potawatomi,* 498 U.S. at 510–12, 111 S.Ct. at 909–11.

In *Potawatomi,* the tribe sought to avoid the concomitant responsibilities inherent in the federal system, invoking the complete immunity, much like a foreign state, to preclude a state from suing them. On the other hand, the tribe in *Blatchford* sought to invoke the federal system's rights, much like a domestic state, and sue a state for monetary damages in federal court. Given the blatant inequities of such a stance, the principles inherent in the federal system, especially those requiring mutual concessions, mandated the result in *Blatchford.* The *Blatchford* decision recognizes the Tribes cannot have it both ways.

■ Absent any "mutuality of concession" *vis a vis* the Blackfeet Tribe of Indians and the State of Montana regarding their respective rights to sovereign immunity, any claim that Montana has surrendered its immunity and consented to suit in Blackfeet Tribal Court is without merit. *See, Blatchford,* 501 U.S. at 779, 111 S.Ct. at 2581. As a matter of comity, a tribe may not assert its right to sovereign immunity in Montana's

state district courts, *see, Wippert v. Blackfeet Tribe,* 260 Mont. 93, 859 P.2d 420 (1993), yet refuse to recognize the immunity of another sovereign entity. Such a result is neither fair nor just, nor consistent with the fundamental fairness surrounding the principles of mutuality and reciprocity articulated in *Blatchford.* In addition to benefitting from the rule of immunity underlying *Wippert, supra,* a tribe must, in a reciprocal manner, be subject to its burdens.

### III.

■ A state may, however, expressly waive its sovereign immunity through legislative enactments which intentionally relinquish the state's immunity from suit. *See, Edelman v. Jordan, supra,* 415 U.S. at 673, 94 S.Ct. at 1360–61; *Clark v. Barnard,* 108 U.S. 436, 447, 2 S.Ct. 878, 882, 27 L.Ed. 780 (1883). In the case *sub judice,* Gilham maintains the State of Montana expressly waived its immunity from suit, by virtue of Article II, section 18 of Montana's Constitution. As a result, Gilham contends the State may not invoke its sovereign immunity to defeat or restrict the jurisdiction of the Blackfeet Tribal Court.

■ In order for a state legislature or state constitution to waive Eleventh Amendment immunity, the state's intent to subject itself to jurisdiction in a federal court must be specific. *Atascadero State Hospital v. Scanlon,* 473 U.S. 234, 241, 105 S.Ct. 3142, 3146, 87 L.Ed.2d 171 (1985). In *State of Montana v. Peretti,* 661 F.2d 756 (9th Cir. 1981), the Ninth Circuit Court of Appeals held Article II, Section 18 of the Montana Constitution did not waive Montana's immunity.

In deciding whether a state has waived its constitutional protection under the Eleventh Amendment, we will find waiver only where stated "by the most express language or by such overwhelming implications from text as [will] leave no room for any other reasonable construction." *Edelman v. Jordan,* 415 U.S. 651, 673, 94 S.Ct. 1347, 1360, 39 L.Ed.2d 662 (1974). The language of article 2, section 18, of the

Montana Constitution does not meet that standard.

*Peretti, supra,* 661 F.2d at 758. *See also, Holladay v. State of Montana,* 506 F.Supp. 1317 (D.Mont.1981) ("The Montana waiver of sovereign immunity seems to be limited to consent to be sued in state courts and should not be construed as consent to be sued by private citizens in federal courts.").

 Nothing in the record suggests the State of Montana has waived its sovereign immunity and consented to be sued in tribal court. Montana's limited waiver of immunity for tort actions in its own courts, as set forth in Article II, Section 18 of Montana's Constitution, does not encompass suits in federal court. *See, State of Montana v. Peretti, supra,* 661 F.2d at 758. *See also, Edelman v. Jordan, supra,* 415 U.S. at 677 n. 19, 94 S.Ct. at 1363 n. 19 ("Whether [the state] permits such a suit to be brought against the State in its own courts is not determinative of whether [it] has relinquished its Eleventh Amendment immunity from suits in the federal courts."); *Pennhurst State School & Hospital v. Halderman, supra,* 465 U.S. at 99, 104 S.Ct. at 907. ("A State's constitutional interest in immunity encompasses not merely whether it may be sued, but where it may be sued.").[12] Accordingly, logic dictates that Article II, Section 18 may not be read to abrogate the State of Montana's sovereign immunity and embody a consent to suit in tribal court. To hold otherwise would necessarily result in a substantial threat to the concept of sovereignty inherent in our constitutional system. Moreover, subjecting the State of Montana to tort liability in tribal court would undoubtedly occasion a deleterious effect on the relationship between the State of Montana and the various Indian reservations within its borders. The State could conceivably be forced to isolate assets from tribal court judgments, and reduce its contacts with the reservations, all to the det-

riment of the reservations and the inhabitants thereof.

## CONCLUSION

Therefore, for the reasons set forth above, the court concludes that given the absence of an unequivocal waiver of the State of Montana's sovereign immunity and consent to be sued in tribal court, the Blackfeet Tribal Court lacked jurisdiction over the state of Montana in the underlying action. Accordingly, the court concludes the summary judgment motion filed on behalf of the State of Montana be, and the same hereby is, GRANTED. The summary judgment motion filed on behalf of Toni Gilham is likewise DENIED.

IT IS SO ORDERED.

---

**12.** For this reason, the Court has consistently held a State's waiver of immunity in its own courts is not a waiver of its Eleventh Amendment immunity in federal court. *Pennhurst State School & Hospital v. Halderman, supra,* 465 U.S. at 99 n. 9, 104 S.Ct. at 908 n. 9, *citing, Florida Dept. of Health & Rehabilitative Services v. Florida Nursing Home Assn.,* 450 U.S. 147, 150, 101 S.Ct. 1032, 1034–35, 67 L.Ed.2d 132 (1981). "It is not consonant with our dual system for the federal courts ... to read the consent to embrace federal as well as state courts.... [A] clear declaration of the state's intention to submit its fiscal problems to other courts than those of its own creation must be found." *Id., quoting, Great Northern Life Insurance Co. v. Read,* 322 U.S. 47, 54, 64 S.Ct. 873, 876–77, 88 L.Ed. 1121 (1944).